1  SHAWN N. ANDERSON
   United States Attorney
2  MIKEL W. SCHWAB
   JESSICA F. WESSLING
3  ERIC S. O'MALLEY
   Assistant U.S. Attorneys
4  Sirena Plaza, Suite 500
   108 Hernan Cortez Avenue
5  Hagåtña, Guam 96910
   TEL:  (671) 472-7332
   FAX:  (671) 472-7215
6
   Attorneys for the United States of America
7

**FILED**
Clerk
District Court

DEC 3 0 2022

for the Northern Mariana Islands
By _____
(Deputy Clerk)

8       **IN THE UNITED STATES DISTRICT COURT**

9       **FOR THE NORTHERN MARIANA ISLANDS**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Civil Case No. _____  **CV   22-00020** |
| Plaintiff, | |
| vs. | |
| $271,087.88 IN U.S. CURRENCY SEIZED FROM BANK OF SAIPAN ACCOUNT NO. ENDING IN LAST FOUR DIGITS 0157, HELD IN THE NAME OF "MCS"; | **VERIFIED COMPLAINT FOR FORFEITURE *IN REM*** |
| and | |
| $39,188.38 IN U.S. CURRENCY SEIZED FROM BANK OF SAIPAN ACCOUNT NO. ENDING IN LAST FOUR DIGITS 2098, HELD IN THE NAME OF "MCS"; | |
| Defendants. | |

Plaintiff, United States of America, by and through its attorneys, Shawn N. Anderson,

United States Attorney for the Districts of Guam and the Northern Mariana Islands, Jessica F.

Wessling, Eric S. O'Malley, and Mikel W. Schwab, Assistant United States Attorneys, bring this

verified complaint for forfeiture in a civil action *in rem* against the defendant amounts of seized

funds and allege as follows in accordance with Supplemental Rule G(2) of the Supplemental

1

1 | Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, Federal Rules of Civil

2 | Procedure (hereafter the "Supplemental Rules"):

3 | **NATURE OF THE ACTION**

4 | 1.      This is a civil forfeiture action *in rem* brought against the Defendant amounts of

5 | seized funds, namely, $271,087.88 in U.S. Currency Seized From Bank of Saipan Account No.

6 | Ending in Last Four Digits 0157 ("MCS Account 1"), Held in the Name of a company

7 | hereinafter referred to as "MCS" ("Defendant $271,087.88"), and $39,188.38 In U.S. Currency

8 | Seized From Bank of Saipan Account No. Ending in Last Four Digits 2098 ("MCS Account 2"),

9 | Held in The Name of MCS ("Defendant $39,188.38") (collectively, "Defendant Funds") under

10 | Title 18, United States Code, Section 981(a)(1)(C).

11 | 2.      This action arises out of an investigation of the Federal Bureau of Investigation

12 | ("FBI") and U.S. Internal Revenue Service – Criminal Investigation ("IRS-CI") of a suspected

13 | conspiracy by foreign entities and entities and individuals in the Commonwealth of the Northern

14 | Mariana Islands ("CNMI") to commit wire fraud and money laundering.  The suspected

15 | conspiracy involved the transfer of funds, including by international wire transfer, for the

16 | purpose of promoting two schemes to defraud: first, to promote the misrepresentation of material

17 | facts to, and the concealment of material information from CNMI regulatory authorities, in

18 | violation of Title 18, United States Code, Section 1343; and second, to illegally influence

19 | government officials in exchange for preferential treatment, thereby depriving the citizens of the

20 | CNMI of their intangible right to honest services of those CNMI government officials, in

21 | violation of Title 18, United States Code, Sections 1343 and 1346.  The suspected conspiracy

22 | involved a third scheme, to evade the payment of the proper amount of income taxes owed to the

23 | CNMI government, in violation of Title 18, United States Code, Section 1343.

24

2

3.        In the case of the first two schemes, conspirators used international wire transfers made with the intent to promote the carrying on of any one or more of these wire fraud schemes, each of which constituted specified unlawful activity. The wire transfers therefore constituted acts of international promotional money laundering, in violation of Title 18, United States Code, Section 1956(a)(2)(A), and the conspiracy to make those international wire transfers to promote the wire fraud activity in the CNMI, in turn, violated Title 18, United States Code, Section 1956(h). The second scheme also involved acts of laundering of monetary instruments and transacting in criminal proceeds in violation of Title 18, United States Code, Sections 1956(a)(1) and 1957(a).

4.        As further detailed below, the United States claims that these actions involving the above-captioned Defendant Funds resulted in violations of Title 18, United States Code, Sections 1343, 1346, 1349, 1956(a)(1), 1956(a)(2)(A), 1956(h), and 1957(a) as proceeds of, involved in, and/or used to facilitate the crimes.

## JURISDICTION AND VENUE

5.        Plaintiff brings this action *in rem* in its own right to forfeit and condemn the Defendant Funds. This Court has jurisdiction over an action commenced by the United States under Title 28, United States Code, Section 1345, and over an action for forfeiture under Title 28, United States Code, Section 1355(a).

6.        This Court has *in rem* jurisdiction over the Defendant Properties Title 28, United States Code, Section 1355(b)(1).

7.        Venue is proper in this district pursuant to Title 28, United States Code, Sections 1355(b)(1) and 1395 because the acts or omissions giving rise to the forfeiture occurred in this district and in the Commonwealth of the Northern Mariana Islands ("CNMI"). The Defendant Funds are currently held in a bank account in the United States. Certain of the companies

involved are headquartered in the District of the CNMI, and most of the individuals involved are residents in the District of the CNMI.

## RELEVANT NAMES AND ENTITIES

8.      A.Y. is a resident of the CNMI.  A.Y. is the sole owner and operator of MCS. MCS maintained MCS Account 1 and MCS Account 2 for which A.Y. was the sole signatory (collectively "MCS Accounts").  A.Y. incorporated MCS for the stated purpose of "banking and financial services, real estate development, and business management."

9.      A Chinese investment holding company ("Foreign Parent Company") is registered in Bermuda and headquartered in Hong Kong, Peoples Republic of China.  Foreign Parent Company owns a company registered in the British Virgin Islands.  In turn, the company registered in the British Virgin Islands owns a company registered and incorporated in the CNMI ("Domestic Subsidiary Company"; collectively with its parent companies, the "Company").  Records revealed that Foreign Parent Company maintained a China Minsheng Banking Corp, Ltd. bank account in Hong Kong, Peoples Republic of China ("Foreign Parent Account"). Domestic Subsidiary Company maintained a BOS account in the CNMI ending in 2023 ("Domestic Subsidiary Account").  Over the course of the scheme, the Company was building a resort and casino in the CNMI.

10.     Between in or about August 2017 through in or about November 2019, Foreign Parent Company utilized a company based in Hong Kong ("Foreign Payroll Company") that purported to provide professional business services.  These services included payroll services. Foreign Payroll Company maintained an HSBC bank account in Hong Kong ending in 0838 ("Foreign Payroll Account").

11.     "Individual 1" is a resident of the CNMI and is partner in a business in the CNMI.

12.     "Individual 2" is a resident of the CNMI and is partner in a business in the CNMI.

4

13.    "Individual 3" is a resident of and a political figure in the CNMI who owes a fiduciary duty to the citizens of the CNMI.

14.    "Individual 4" is a resident of and a political figure in the CNMI who owes a fiduciary duty to the citizens of the CNMI.

## DEFENDANT FUNDS

15.    Defendant Funds were seized by IRS-CI special agents pursuant to a federal seizure warrant issued by Chief Judge Ramona V. Manglona.  On November 12, 2019, pursuant to the seizure warrant, the Bank of Saipan issued two cashier's checks made payable to the United States Treasury – one for $271,087.88 and the other for $39,188.38. On November 14, 2019, the warrant was returned and certified before the Court.

16.    Defendant Funds are currently in the custody of the United States Department of the Treasury on behalf of IRS-CI.  The Defendant Funds were seized in the District of the Northern Mariana Islands.

## BASIS FOR FORFEITURE

17.    The Defendant Funds are subject to forfeiture under Title 18, United States Code, Section 981(a)(1)(C) as property items that constitute or were derived from proceeds traceable to violations of both Title 18, United States Code, Sections 1343 (wire fraud), a crime that constitutes "specified unlawful activity," as defined in Title 18, United States Code, Section 1956(c)(7), including cross-reference to Title 18, United States Code, Section 1961(1)(B), as well as conspiracy to engage in wire fraud, in violation of Title 18, United States Code, Section 1349.

18.    Title 18, United States Code, Section 981(a)(2)(A) defines "proceeds," for cases involving unlawful activities, as "property of any kind obtained directly or indirectly, as the

5

result of the commission of the offense giving rise to forfeiture, and any property traceable
thereto, and is not limited to the net gain or profit limited realized from the offense."

19.     The Defendant Funds are also subject to forfeiture under Title 18, United States
Code, Section 981(a)(1)(A) as property items that were involved in money laundering
transactions, committed in violation of Title 18, United States Code, Section 1956 (Laundering
Monetary Instruments) and Title 18, United States Code, Section 1957 (Transacting in Criminal
Proceeds), as well as conspiracy to engage in money laundering, in violation of Title 18, United
States Code, Section 1956(h).

## FACTS GIVING RISE TO FORFEITURE

### A.  Background of the schemes

20.     Beginning in 2013, the owners and operators of the Company established
relationships with CNMI political figures by, *inter alia*, sponsoring foreign trips, including to
Hong Kong and Macau, and on at least one occasion, to Singapore via private jet.

21.     Following the trips, the participating political figures joined other members of the
CNMI legislature to pass a bill which enabled an exclusive gaming license on a certain island
within the CNMI.

22.     The bill contemplated an open competition for the exclusive gaming license.

23.     The CNMI Senate passed the bill on the first and final reading. The bill was
signed into law in March 2014.  However, procedural violations that deprived the public of
required notice and other defects resulted in two subsequent bills to correct the errors.  The final
bill was signed into law in July 2014.  Individual 3 played an integral role in passage of the
casino enabling legislation.

24.     Approximately one month later, a body of appointed CNMI government officials
awarded the exclusive license to the Company after the only other bidder was disqualified.

6

1    25.        Months prior to receiving the license, in May 2014, the Company had already
2    begun paying MCS and A.Y. several thousand dollars per month.

3    26.        On or about June 1, 2015, A.Y. signed a letter agreement with the Domestic
4    Subsidiary Company for MCS to serve as a "consultant" at a rate of $5,000 per month.[1]  Under
5    this agreement, MCS was to receive reimbursements for costs and expenses only if such
6    payments were previously approved by the Domestic Subsidiary Company.

7    27.        Days later, on or about June 18, 2015, A.Y. signed a second letter agreement with
8    the Foreign Parent Company to be a "consultant" at a rate to be "further determined and agreed
9    in writing… ." Under the second agreement, A.Y. was to be reimbursed by the Foreign Parent
10   Company for "all reasonable costs and expenses" upon production of receipts.

11   28.        Three years later, A.Y. and the Domestic Subsidiary Company signed an
12   "amended agreement" dated November 6, 2018, which established that A.Y. would be paid at a
13   rate of $184,000 Hong Kong dollars (approximately $23,500 United States dollars) per month,
14   and the Domestic Subsidiary Company would only reimburse pre-approved expenses.

15   29.        The written agreements do not fully or accurately depict the true financial
16   dealings or the relationship between the Company and MCS.  In practice, the majority of
17   financial dealings between the Company and MCS appear to be informal, if not *ad hoc*, and
18   MCS's actions on behalf of the Company exceeded the scope of legitimate lobbying or
19   consulting.

20   30.        Between in or about 2014 and in or about 2019, the Company transferred more
21   than two million dollars to MCS and A.Y. primarily via three routes: (1) monthly checks of
22   $5,000 from the Domestic Subsidiary Account that were deposited to MCS Accounts; (2)

23

24   ------------
[1] During the course of the investigation, the United States uncovered no evidence of a signed agreement between the parties prior to June 1, 2015.

1 | monthly international wire transfers of approximately $34,000 or $35,000, at first directly from

2 | the Foreign Parent Account in Hong Kong to MCS Account, and then indirectly through the

3 | Foreign Payroll Account in Hong Kong to MCS Account 1; and (3) frequent reimbursements

4 | from the Foreign Parent Account in Hong Kong to an account held by A.Y. in China (which, as

5 | noted in paragraph 75, A.Y. failed to report as required by U.S. law).

6 | 31.     The reimbursements from the Foreign Parent Account to A.Y.'s foreign account

7 | were for "expenses" paid from MCS Accounts in the CNMI.

8 | 32.     Contrary to the written agreements, the majority of these reimbursements were

9 | neither pre-approved nor supported by receipts.  In one instance in August 2016, A.Y. invoiced

10 | the Company for a $120,000 reimbursement that simply described "special projects".

11 | **B.  Scheme to defraud the Commonwealth Casino Commission**

12 | 33.     Between in or about 2014 and in or about 2019, A.Y., MCS, the Company, and

13 | others knowingly devised a scheme and artifice to defraud the CNMI and Commonwealth

14 | Casino Commission ("CCC") , in violation of Title 18, United States Code, Sections 1343 and

15 | 1349.  The scheme to defraud involved false statements of material fact and the concealment of

16 | material information that A.Y. and MCS had a duty to disclose to the CCC, with intent to

17 | defraud, and the transmitted interstate and international wire communications in furtherance of

18 | the scheme.  The essence of the scheme to defraud was to materially understate the extent of the

19 | services that A.Y. and MCS provided to the Company.  The effects of the scheme to defraud

20 | were to frustrate the CCC's ability to accomplish its mission of overseeing and regulating the

21 | Company's operations and to deprive the CCC of fees to which it was entitled.

22 | 34.     The CCC is the body charged with regulating the holder of the exclusive casino

23 | license and is generally responsible for guarding against the infiltration of criminal influences in

24 | an industry prone to such influences.

1    35.    Accordingly, by CNMI law, the CCC must promulgate and enforce rules and

2  regulations that monitor and govern the Domestic Subsidiary Company's operations.[2]

3    36.    In furtherance of these responsibilities, the CCC requires that all vendors who

4  provide "services of any kind" to the Company or its affiliates in excess of a set threshold must

5  be licensed by the CCC.[3]  The original threshold amount, set by regulation in October 2016, was

6  $100,000 per year, but the CCC raised the amount to $250,000 per year in January 2017.

7  Applying for a license requires service providers to complete a lengthy application form, to

8  submit to an investigation, and to pay a non-refundable $5,000 application fee and a $5,000

9  biannual renewal fee.[4]  Unlicensed service providers are prohibited from doing business with the

10  Company in excess of the threshold amount.[5]

11    37.    The purpose of this regime is to promote transparency, by subjecting those who

12  engage in significant business activity with the Company to heightened diligence.

13    38.    By regulation, the Company is required to provide the CCC with a monthly

14  "Master Vendor List" of every company and individual who transacted business with the

15  Company, including the amount of business transacted.[6]  The Company and the vendors have a

16  duty to report this information completely and accurately so the CCC can effectively perform its

17  mission.  The Master Vendor List also allows the CCC to detect whether a particular service

18  provider must be licensed.

19

20

21

22    _____

[2] 4 C.M.C. § 2314.

23    [3] Commonwealth Casino Commission Regulations § 175-10.1-1305(b).  There are exceptions under this
regulation, none of which are applicable in this case.

[4] Commonwealth Casino Commission Regulations §§ 175-10.1-1320 and 177-10.1-1225.

24    [5] Commonwealth Casino Commission Regulations § 175-10.1-1390.

[6] Commonwealth Casino Commission Regulations § 175-10.1-1380.

39.     The CCC is authorized to access and verify accounting and bank records at the Domestic Subsidiary Company.  It can therefore verify whether the Master Vendor List is accurate for payments to vendors from the Domestic Subsidiary Account.

40.     However, the CCC cannot access and verify accounting and bank records at the Foreign Parent Company, a fact A.Y. and the Company chose to exploit.

41.     From approximately January 2014 until in or about November 2019, A.Y. and MCS provided services to the Company and its affiliates, namely consulting and lobbying services. A.Y. first registered MCS with the Commonwealth Election Commission ("CEC") as a lobbyist for the Company in July 2015. A.Y. continued to register as its lobbyist and consultant through at least 2018.

42.     Throughout those years, A.Y. was a steadfast advocate for the Company.  In addition to regularly appearing and participating in official meetings, arranging overseas tours for CCC and other government personnel, A.Y. also arranged and was privy to numerous private discussions between the Company's owners and the highest echelons of the CNMI government.

43.     A.Y. was providing these services up to the date of the seizure warrant, on November 12, 2019.

44.     From in or about 2014 to in or about November 2019, A.Y. and MCS received payments from the Company for services rendered to the Company that far exceeded the threshold for A.Y. and MCS to obtain and maintain a license from the CCC.  Specifically, during this period, MCS received $5,000 per month by check from the Domestic Subsidiary Accounts as well as at least $34,000 per month by international wire transfer from either the Foreign Parent Company in Hong Kong or the Foreign Payroll Company in Hong Kong to MCS Account.

The approximate combined funding sources are illustrated as follows:

| ENTITY | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|
| Foreign Parent | $225,814 | $393,722 | $457,328 | $33,980 | | |
| Domestic Subsidiary | $20,000 | $50,000 | $63,086 | $46,500 | $19,138 | $72,668 |
| Foreign Payroll | | | | $238,000 | $272,000 | $396,175 |
| **Total** | **$245,814** | **$443,722** | **$520,413** | **$318,480** | **$291,138** | **$468,843** |
| **License Threshold** | $100,000 | $100,000 | $100,000 | $250,000 | $250,000 | $250,000 |

45.     A.Y., MCS, and the Company conspired to structure MCS's income streams from the Company so that only the amounts paid by the Domestic Subsidiary Company to MCS appear on the Master Vendor List. These amounts are below the threshold that would require a CCC license. In truth, as A.Y., MCS, and the Company knew, the Company paid MCS amounts well in excess of the threshold that would require A.Y. and MCS to obtain a CCC license.

46.     Neither MCS nor A.Y. obtained a CCC vendor license, and by engaging in this scheme, were able to conduct significant business dealings with the Company while escaping the heightened CCC diligence to which they were, by law, subject, and while avoiding payment required fees to the CCC.

47.     This deprived the CCC of its ability to perform its missions, in addition to depriving it of the $5,000 application fee that MCS owed in 2014, as well as the $5,000 renewal fees in 2016 and 2018.

48.     A.Y., MCS, and the Company conspired to have the Company make the $34,000 monthly payments by international wire transfer from either the Foreign Parent Company in Hong Kong or the Foreign Payroll Company in Hong Kong to MCS Account 1 to promote this scheme to defraud the CCC and the CNMI. Those international transfers of money from Hong Kong to the CNMI therefore constituted international promotional money laundering payments,

1  in violation of Title 18, United States Code, Section 1956(a)(2)(A), that promoted the wire fraud
2  scheme and conspiracy, which were specified unlawful activity in violation of Title 18, United
3  States Code, Sections 1343 and 1349.

4  **C.  Scheme to deprive the people of the CNMI of the intangible right to honest services**

5      49.         Between in or about 2014 and in or about 2019, A.Y., MCS, Individual 1,
6  Individual 2, Individual 3, Individual 4, the Company, and others knowingly devised a scheme
7  and artifice to deprive the people of the CNMI of the intangible right to honest services by
8  providing a stream of benefits to, for, or on behalf CNMI government officials for the purpose of
9  gaining preferential treatment for the Company, and in doing so communicated by wire in
10  interstate and foreign commerce, and conspired to engage in that honest services fraud scheme,
11  in violation of Title 18, United States Code, Sections 1343, 1346, and 1349.

12      50.         Bank records and CNMI campaign financial statements show that from in or
13  about June 2014 through in or about January 2019, A.Y. and MCS used funds provided by the
14  Company and channeled through MCS Accounts to contribute more than $46,000 to various
15  individual candidates, campaigns, inauguration committees, and political parties--including
16  Individual 3 and Individual 4.  These amounts include a $10,000 contribution to an inaugural
17  committee in January 2019.[7]

18      51.         The candidates' CNMI campaign statements of account frequently failed to
19  disclose A.Y. and MCS's contributions to their campaigns.

20      52.         During that same period, including until in or about November 2019, A.Y.
21  arranged and at least partially paid for several overseas trips for CNMI government officials
22  (including Individual 4 on at least one occasion), frequently met with government officials for

23

24  _____
[7] Although not alleged as a basis for forfeiture, the government notes these were likely violations of Title 52, United States Code, Section 30121.

1  golf, meals, drinking, and karaoke, and typically used A.Y.'s credit card to cover the bill. These

2  payments frequently exceeded $100 and occasionally $1,000.

3      53.    CNMI law generally bars CNMI government officials from accepting non-

4  monetary gifts with value greater than $50; therefore, these payments violated the CNMI

5  Government Ethics Code.[8]

6      54.    A.Y. used money from the MCS Accounts to pay off the credit card that A.Y.

7  used to pay for travel, golf, meals, drinking, and karaoke for government officials.

8      55.    While A.Y. defined a portion of the money he received from the Company as

9  A.Y.'s personal salary and business income from MCS, CNMI tax filings from 2014 to 2019

10  show that A.Y. treated a substantial portion of the money that he received from the Company as

11  "business expenses," namely the payments for travel, golf, meals, drinking and karaoke with

12  government officials. Such expenses included nearly $200,000 for travel, meals, and

13  entertainment, as well as at least $100,000 for non-specifically defined "other" expenses.

14      56.    MCS Account records between 2014 and 2019 show frequent cash withdrawals

15  and encashments of checks made payable to A.Y., typically in increments of $1,000. Bank

16  records for Individuals 1 and 2 show numerous cash deposits typically in increments of $1,000.

17  A.Y. frequently met with Individuals 1 and 2, meetings that coincide with deposits of cash in

18  increments of $1,000 into accounts belonging to Individual 1 or Individual 2, or to their business.

19      57.    Individuals 1 and 2 are closely affiliated with Individual 3, and evidence shows

20  that Individuals 1 and 2 frequently gave substantial amounts of money to Individual 3.

21      58.    Finally, according to CNMI tax and other records between 2016 and 2018, MCS

22  spent more than $320,000 on "legal and professional fees", nearly half of which were, in fact,

23

24  [8] 1 C.M.C. § 8551(b) presumes that gifts with value $50 or more implies an understanding that a government official will be influenced in the conduct of their duties.

1 | payments from MCS Account 2 to persons in the CNMI who could influence policy involving
2 | the Company, including one person close to Individual 4.

3 | 59.     Although several of these payees were purportedly hired as "consultants" to MCS,
4 | A.Y. did not ask, expect, or receive much in exchange from for these fees.

5 | 60.     In the case of the person close to Individual 4, MCS paid that person $62,500 over
6 | one year.  In exchange, that person provided MCS with less than 8 pages of "memos," much of
7 | whose content consisted of little more than publicly available information that was cut and
8 | pasted from sources readily found on the internet.

9 | 61.     In exchange for the benefits described herein that A.Y., the CNMI government
10 | (with involvement from Individual 3, Individual 4, and other officials who benefitted from
11 | MCS's largesse) extended the Company uniquely favorable treatment, including but not limited
12 | to, allowing the Company to escape liquidated damages after missing construction deadlines,
13 | extending the Company's operation and related deadlines with little or no penalty, amending
14 | regulations to accommodate the Company's development schedule, and deferring enforcement of
15 | tax, labor, and other contractual obligations owed by the Company to the CNMI.

16 | 62.     In one example of particular importance, Individual 3, Individual 4, A.Y., and
17 | certain officials A.Y. sought to influence through unethical gifts, undermined various efforts to
18 | mandate that the Company either provide verifiable proof that it was financially capable of
19 | completing its construction project, or to at least post a "completion bond."

20 | 63.     As of the date of this complaint, the project is far from complete, it appears the
21 | Company does not have enough money to finish it, and there is no completion bond in place to
22 | mitigate the damage.

23 | 64.     To conceal this conspiracy and scheme to deprive the people of the CNMI of the
24 | honest services of Individual 3, Individual 4, and other CNMI politicians, A.Y. engaged in

specific acts of deception against the CNMI government.  Pursuant to the CNMI Lobbying Disclosure Act, the CEC requires lobbyists to disclose contributions and expenditures in their yearly renewal application, which includes a "Statement of Contributions and Expenditures" form that is filed and signed under penalty of perjury.[9]

65.       A.Y.'s filings from 2015 through 2018 swear that MCS received no contributions and made no expenditures in furtherance of its lobbying activities, a claim directly contradicted by MCS's own business records and tax filings.

66.       Conspirators engaged in international promotional money laundering in furtherance of the wire fraud.  Necessary to and in furtherance of the scheme, from in or about May 2014 to in or about November 2019, the Foreign Parent Company and the Foreign Payroll Company regularly transferred money by international wire from accounts in Hong Kong to MCS Account 1 in the CNMI, in violation of Title 18, United States Code, Sections 1956(a)(2)(A) and 1956(h).

67.       Conspirators engaged in financial transactions with the intent to promote the carrying on of the above-described honest services fraud conspiracy and scheme, committed in violation of Title 18, United States Code, Sections 1343, 1346, and 1349, all in violation of Title 18, United States Code, Sections 1956(a)(1) and 1956(h).  Specifically, from in or about July 2014 to in or about November 2019, A.Y. transferred more than 85 percent of the total funds in MCS Account 1 (89 percent of whose deposits at relevant times came from accounts in China) into MCS Account 2, totaling approximately $1.579 million, effectively masking that the funds originated from foreign entities and from the Company.

---

[9] 1 C.M.C. § 9414.

68.        In addition, some of those transfers of funds from Account 1 to Account 2 consisted of more than $10,000 in proceeds of the honest services fraud scheme, as A.Y. then knew, and therefore constituted unlawful monetary transactions in violation of Title 18, United States Code, Section 1957.

**D. Scheme to defraud the government of the CNMI**

69.        Between in or about April 2016 and in or about June 2019, A.Y. and others devised a scheme and artifice to defraud the CNMI government of money, specifically tax revenue, by means of false and fraudulent pretenses, and transmitted and caused to be transmitted electronic signals in the course of doing so, in violation of Title 18, United States Code, Section 1343.

70.        As discussed in paragraph 58, MCS's CNMI tax filings for the years 2016 through 2018 claim MCS spent more than $320,000 on "legal and professional services."

71.        Other records establish that the "professional services" to which the tax filings refer correspond to MCS's payments to its "consultants," illustrated as follows:

| Tax Year | Legal & Professional Services (as reported on F1040CM) | Consultant Expenses (Bank Records) |
|---|---|---|
| 2016 | $94,670 | $67,500 |
| 2017 | $165,733 | $63,200 |
| 2018 | $60,000 | $10,000 |
| **Total** | **$320,403** | **$140,700** |

72.        The tax filings treat these amounts as overhead/business expenses incurred by MCS that reduced its revenue and therefore its associated tax liability.   However, invoices and other records demonstrate that these representations were materially false and fraudulent because the Company reimbursed A.Y. for these and other payments.  It did so in a way that would be

1  difficult if not impossible for the CNMI government to discover, namely, by sending the money
2  directly from one foreign bank account to another foreign bank account.

3  73.      Indeed, between in or about May 2014 and in or about November 2019, the
4  Foreign Parent Company wire-transferred in excess of $370,000 to A.Y.'s Bank of China
5  account ending in 2854.  These transfers did not transit any U.S. bank account or company and
6  were therefore hidden from CNMI revenue collectors.

7  74.      By claiming this money as an expense paid from a MCS Account while failing to
8  report that he was being reimbursed overseas, A.Y. made materially false statements and
9  omissions on MCS's 2016, 2017, and 2018 tax returns that deprived the CNMI of substantial tax
10 revenue to which it was entitled, and thereby defrauded the government of CNMI in violation of
11 18 U.S.C. § 1343.

12 75.      In furtherance of the scheme to defraud, A.Y. concealed his assets from the
13 United States.  U.S. Department of Treasury records also show that A.Y. knowingly and
14 willfully failed to file a Report of Foreign Bank and Financial Accounts ("FBAR") with the
15 Department of Treasury for calendar years 2014, 2015, 2016, and 2017, with respect to accounts
16 involved in this third stream of income (as well as other foreign accounts).   The Bank Secrecy
17 Act mandates that U.S. citizens who have a financial interest in, or signature authority over,
18 financial account(s) in a foreign country with an aggregate value of more than $10,000 at any
19 time during a particular year must file an FBAR with the U.S. Department of Treasury.  A.Y.
20 knew of this requirement because records show that he previously filed an FBAR, reporting that
21 in 2013 he held eight foreign bank accounts in China and the Philippines.  In the following years,
22 A.Y.'s bank records show he transferred and received amounts exceeding $10,000 to and from
23 foreign accounts in his name and did not file the required reports in violation of Title 31, United
24

17

1  States Code, Section 5314.[10]  A.Y.'s intentional avoidance of this requirement, dating roughly

2  from when he began his association with the Company, reinforces the belief that A.Y.

3  intentionally tried to conceal the source of his and MCS's income because it was being used to

4  facilitate unlawful activities.

5                              **NEXUS TO THE FRAUDULENT SCHEMES**

6      76.           Financial analysis establishes that Defendant Funds were necessary to perpetrate

7  and are traceable to schemes that involved international wirings, withholding of material

8  information from the CCC, payments to CNMI government officials or persons close to CNMI

9  government officials for the purpose of improperly influencing said officials, and materially false

10  statements and omissions to regulatory and tax collection agencies of the CNMI government, all

11  in violation of 18 U.S.C. §§ 1343, 1346, 1349, 1956(a), 1956(a)(2)(A), and 1957(a).

12      77.           In the first scheme, Defendant Funds were transferred in a way that was necessary

13  to and enabled a fraud upon a government regulatory authority, namely, the CCC.  In the second

14  scheme, Defendant Funds were part of and necessary to a long-running and expansive effort to

15  improperly influence government officials for the purpose of obtaining preferential treatment.

16  Finally, A.Y. and MCS used Defendant Funds to claim false expenses, thus fraudulently

17  reducing tax liability to the CNMI, when in fact those amounts were reimbursed to A.Y.

18                  **CLAIMS FILED IN ADMINISTRATIVE FORFEITURE PROCEEDING**

19      78.           On or about January 3, 2020, A.Y. and MCS filed a claim to the Defendant

20  Properties with the Internal Revenue Service in the administrative forfeiture proceeding. Their

21  claim was denied. The United States sought and received extensions for the deadline for the

22

23

24
_____
[10] Title 31, United States Code, Section 5314 is not a forfeitable offense.

filing of this civil complaint. *See* Miscellaneous Case No. 20-0025 (under seal). The current

deadline is December 30, 2022. *Id.*

## CLAIM FOR RELIEF - FORFEITURE
### [Defendant Properties - 18 U.S.C. § 981(a)(1)(A) and (C)]

79.      Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1

through 76 above.

80.      By the foregoing and other acts, the Defendant Properties are forfeitable as

property involved in a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956

and/or 1957.

81.      By the foregoing and other acts, the Defendant Properties constitute or are derived

from proceeds traceable to a violation of 18 U.S.C. §§ 1956, 1957, and/or 1343, or a conspiracy

to commit such offense.

82.      As a result of the foregoing, the Defendant Properties are subject to forfeiture to

the United States in accordance with 18 U.S.C. § 981(a)(1)(A) and (C), including cross-

references to 18 U.S.C. §§ 1956(c)(7) and 1961(1).

WHEREFORE, the plaintiff United States of America prays that a warrant *in rem* be

issued for the arrest of the Defendant Properties and that due notice be given to all parties to

appear and show cause why the forfeiture should not be decreed; that judgment be entered

declaring the Defendant Properties be forfeited to the United States of America for disposition

//

//

//

//

//

1 │ according to law; and that the United States of America be granted such other relief as this Court

2 │ may deem just and proper, together with the costs and disbursement of this action.

3 │     Respectfully submitted this 30th day of December, 2022.

4 │                                          SHAWN N. ANDERSON
  │                                          United States Attorney
5 │                                          Districts of Guam and the NMI

6 │                              By:    /s/ Jessica F. Wessling
  │                                     JESSICA F. WESSLING
7 │                                     ERIC S. O'MALLEY
  │                                     Assistant U.S. Attorneys

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1

VERIFICATION

2    I, Nathan Miyake, Criminal Investigator with the Internal Revenue Service – Criminal

3    Investigations, hereby verify and declare under penalty of perjury, pursuant to 28 U.S.C. § 1746,

4    that I have read the foregoing Verified Complaint for Forfeiture *In Rem* and know of the contents

5    thereof, and that the matters contained in the Verified Complaint are true to my knowledge,

6    except for matters herein stated to be alleged on information and belief, and as to those matters I

7    believe them to be true.

8        The sources of my knowledge and information and the grounds of my belief are based

9    upon reports and information known to me and/or furnished to me by other law enforcement

10   representatives, as well as my investigation of this case, and that everything represented herein is

11   true and correct.

12       Executed on this 30th day of December, 2022.

13

14   Nathan Miyake

15   Criminal Investigator

16   IRS-CI

17

18

19

20

21

22

23

24