MARK B. HANSON, ESQ.
Second Floor, Macaranas Building
Beach Road, Garapan
PMB 738 P.O. Box 10,000
Saipan, N. Mariana Islands 96950
Telephone:    (670) 233-8600
Facsimile:    (670) 233-5262
E-mail:    markbhanson@gmail.com

Attorney for *Claimants Marianas Consultancy Services, LLC and Alfred Yue*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) CASE NO.    1:22-cv-00020 |
| Plaintiff, | ) |
| vs. | ) |
| $271,087.88 IN U.S. CURRENCY SEIZED FROM BANK OF SAIPAN ACCOUNT NO. ENDING IN LAST FOUR DIGITS 0157, HELD IN THE NAME OF "MCS" | ) MOTION TO DISMISS VERIFIED COMPLAINT FOR FORFEITURE *IN REM* |
| and | ) |
| $39,188.38 IN U.S. CURRENCY SEIZED FROM BANK OF SAIPAN ACCOUNT NO. ENDING IN LAST FOUR DIGITS 2098, HELD IN THE NAME OF "MCS," | ) |
| Defendants. | ) Date:<br>) Time:<br>) Judge: |

CLAIMANTS Marianas Consultancy Services, LLC ("MCS") and Alfred Yue ("Yue"), by and through their undersigned counsel, hereby move to dismiss the Verified Complaint for Forfeiture *In Rem* (ECF No. 1) filed by the United States in the above-captioned case on December 30, 2022 (the "Complaint"). This Motion is brought pursuant to Rule G(8)(b)(I) of the Federal Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions and Rule 12(b)(6) of the Federal Rules of Civil Procedure. The Complaint fails to allege any viable predicate criminal offense that would provide grounds to forfeit the defendant property (the "Defendants Funds"), in whole or in part, as either proceeds of any specified unlawful activity or as an instrument of international

1   promotional money laundering.

2       Supplemental Rule G requires a forfeiture complaint to "state sufficiently detailed facts to

3   support a reasonable belief that the government will be able to meet its burden of proof at trial,"

4   which constitutes "a higher standard than 'notice pleading.'" *United States v. Aguilar*, 782 F.3d 1101,

5   1109 (9th Cir. 2015). Because the Complaint fails to state a claim upon which this Court could order

6   the forfeiture to the United States of any of the Defendant Funds in this case, the Complaint must

7   be dismissed. Fed. R. Civ. P. 12(b)(6) and Rules G(5)(b) and G(8)(b)(I) of the Supplemental Rules

8   of Admiralty or Maritime Claims and Asset Forfeiture Actions.

9

10                                TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . 3
BACKGROUND . . . . . . . . . . . . . . . . . . 5
PLEADING STANDARD FOR CIVIL FORFEITURE COMPLAINTS . . . . . . . . . . . . . . . . . . 6
ALLEGED GROUNDS FOR FORFEITURE . . . . . . . . . . . . . . . . . . 8

   A.  International Promotional Money Laundering . . . . . . . . . . . . . . . . . . 8

   B.  Proceeds Money Laundering . . . . . . . . . . . . . . . . . . 8

      Scheme 1 - Defrauding the Commonwealth Casino Commission . . . . . . . . . . . . . . . . 8

      Scheme 2 - Honest Services Wire Fraud . . . . . . . . . . . . . . . . . . 9

      Scheme 3 - Tax Fraud on the Commonwealth of the Northern Mariana Islands . . . . . 10

ARGUMENTS FOR DISMISSAL . . . . . . . . . . . . . . . . . . 10

   1.  The allegations of Scheme 1 (defrauding the CCC) do not constitute wire fraud nor otherwise constitute international promotional money laundering. . . 10

   2.  The Complaint fails to allege a "quid pro quo" related to its allegations of "honest services fraud." . . . . . . . . . . . . . . . . . 14

   3.  The Complaint fails to allege wire fraud related to Scheme 3 (tax evasion). . . . . . . . 19

   4.  There are no plausible "proceeds" allegations to support forfeiture based on 18 U.S.C. § 981(a)(1)(C) ("proceeds money laundering"). . . . . . . . . . . . . . . . 21

CONCLUSION . . . . . . . . . . . . . . . . . . 24

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . 25

1

TABLE OF AUTHORITIES

2

CASES:

3

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

4

*Balistreri v. Pacifica Police Dep't.*, 901 F.2d 696 (9th Cir. 1988) . . . . . . . . . . . . . . . . 6, 7, 7n.2

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) . . . . . . . . . . . . . . . . . . . . . . . 6,7, 7 n.2

5

*Black v. United States*, 561 U.S. 465 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

6

*Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

7

*Cholla Ready Mix, Inc. v. Civish*, 382 F.3d 969 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . 7 n.2

*Cleveland v. United States*, 531 U.S. 12 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 10-13

8

*Epstein v. Washington Energy Co.*, 83 F.3d 1136 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . 7

9

*Kelly v. United States*, 140 S.Ct. 1565 (2020) . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 13

10

*McNally v. United States*, 483 U.S. 350 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

11

*Mitchell v. United States*, 142 F.2d 480 (10th Cir. 1944) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Pasquantino v. United States*, 544 U.S. 349 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . 11, 20

12

*Skilling v. United States*, 561 U.S. 358 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

13

*United States v. $50,040 in U.S. Currency*, 2007 WL 1176631 (N.D. Cal. Apr. 20, 2007) . . . . 7

14

*United States v. $97,667.00 in U.S. Currency*, 538 F. Supp. 2d 1246 (C.D. Cal. 2007) . . . . 7 n.2

*United States v. Aguilar*, 782 F.3d 1101 (9th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 6

15

*United States v. Ali*, 620 F.3d 1062 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . 21-22

16

*United States v. Alston*, 609 F.2d 531 (D.C. Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . 19

17

*United States v. Carpenter*, 961 F.2d 824 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Christensen*, 828 F.3d 763 (9th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . 14

18

*United States v. Inzunza*, 638 F.3d 1006 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

19

*United States v. Jolivet*, 224 F.3d 902 (8th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Kemp*, 500 F.3d 257 (3rd Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

20

*United States v. Kincaid-Chauncey*, 556 F.3d 923 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . 14

21

*United States v. McDonnell*, 136 S. Ct. 2355 (2016) . . . . . . . . . . . . . . . . . . . . . . . 14-15 n.10

22

*United States v. Miller*, 953 F.3d 1095 (9th Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Mondragon*, 313 F.3d 862 (4th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . 6

23

*United States v. One Gulfstream G-V Jet Aircraft*, 941 F. Supp. 2d 1 (D. D.C. 2013) . . . . . . . 6

24

*United States v. Real Prop.*, 2021 WL 144245 (E.D. Ky. Jan. 15, 2021) . . . . . . . . . . . . . . . 7 n.2

25

*United States v. Real Prop. Located In Brentwood, California*,
2016 WL 11121402 (C.D. Cal. Mar. 15, 2016) . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 7 n.2

26

*United States v. Sun-Diamond Groumrs of Cal.*, 526 U.S. 398 (1999) . . . . . . . . . . . . . . . . . . 14

*United States v. Weingarten*, 632 F.3d 60 (2nd Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Wilkes*, 662 F.3d 524 (9th Cir. 2011)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

STATUTES:

18 U.S.C. § 10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

18 U.S.C. § 201 . . . . . . . . . . . . . . . . . . . . 14-15 n.10, 17

18 U.S.C. § 1341 . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 14

18 U.S.C. § 1343 . . . . . 8 n.4-5, 8 n.7-8, 10, 13-14, 20, 21

18 U.S.C. § 1346 . . . . . . . . . . . . . . . . 8 n.5, 8 n.8, 14, 18

18 U.S.C. § 1956(a)(1)(A) . . . . . . . . . . . . . . . . . . . 8 n.6, 21, 24

18 U.S.C. § 1956(a)(2)(A) . . . . . . . . . . . . . . . 8 n.3, 13, 18, 22, 23

18 U.S.C. § 1956(c)(7)(A) . . . . . . . . . . . . . . . . . . . . . . . 8 n.4-8

18 U.S.C. § 1956(h) . . . . . . . . . . . . . . . . . . . . . 8 n.3, 8 n.6

18 U.S.C. § 1957(a) . . . . . . . . . . . . . 8 n.6, 21 n.11, 22, 24

18 U.S.C. § 1961(1) . . . . . . . . . . . . . . . . . . . . . . . . 8 n.4-8

18 U.S.C. § 981(a)(1)(A) . . . . . . . . . . . . . . . . 8, 13, 18, 22-24

18 U.S.C. § 981(a)(1)(C) . . . . . . . . . . . . . . . . . 8, 13, 19, 21, 23

18 U.S.C. § 983(a)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . 5 n.1

RULES AND REGULATIONS:

NMIAC § 175-10.1-105(b)(2) . . . . . . . . . . . . . . . . . . . . . . 11 n.9

NMIAC § 175-10.1-1375(g) . . . . . . . . . . . . . . . . . . . . . . 11 n.9

Federal Supplemental Rules for Admiralty or Maritime Claims

    and Asset Forfeiture Actions

    Rule G(2)(f) . . . . . . . . . . . . . . . . . . . . . . . 6, 15

    Rule G(5)(b) . . . . . . . . . . . . . . . . . . . . . . . . 2

    Rule G(8)(b)(I) . . . . . . . . . . . . . . . . . . . . . . 1-2

SECONDARY MATERIALS:

*Manual of Modern Criminal Jury Instructions for the District Courts*

    *of the Ninth Circuit* § 10.34 (2021) . . . . . . . . . . . . . . . . . . . . . . 17

12 Wright & Miller, Fed. Pract. & Proc. § 3242 (3d ed.) . . . . . . . . . . . . . . . . . . . . . . 6

BACKGROUND

On November 7, 2019, pursuant to a still sealed search warrant issued by this Court based on the allegations of a still sealed affidavit in support thereof in Misc Case 1:19-mc-00045, federal agents raided the office of Claimant MCS in Saipan and seized all of Claimants' business and personal records therein. The following day, pursuant to a separate, still sealed warrant and affidavit, federal agents seized the Defendant Funds. On November 9, 2019, pursuant to a third still sealed warrant and affidavit, federal agents seized funds from a personal savings account of Claimant Yue.

On January 3, 2020, the Internal Revenue Service ("IRS") noticed its intent to administratively forfeit all of Claimants' seized funds including the personal savings account funds of Claimant Yue. Claimants, through counsel, filed a timely claim with the IRS seeking the return of the wrongly seized funds. See Complaint, ¶ 78. Despite the allegation of the Complaint that the claim was denied (*id.*), the claim was never expressly denied by the IRS. The money was simply not returned without explanation. Instead, the United States obtained numerous extensions of the statutory deadline to file a civil forfeiture claim in the District Court,[1] all sought by the United States *ex parte* and under seal and granted under seal in sealed Misc. Case 1:20-mc-00025.

In December 2022, apparently unable to find even a tenuous connection to any illicit activity that they could wedge into a civil forfeiture claim, the United States finally returned to Claimant Yue the funds it seized from his personal savings account and later returned additional funds federal agents had seized from MCS' office and from Claimant Yue personally during their raid in November 2019. The funds seized from MCS accounts, however, are the Defendant Funds the United States is attempting to civilly forfeiture by their Complaint in this case.

The following is Claimants' Memorandum of Points and Authorities in support of their Motion to Dismiss Verified Complaint for Forfeiture *In Rem* and cause the Defendant Funds to be returned to MCS without further delay.

---

[1] *See* 18 U.S.C. § 983(a)(1)(A).

-5-

## PLEADING STANDARD FOR
## CIVIL FORFEITURE COMPLAINTS

Because of the drastic nature of the remedy being sought, complaints for forfeiture *in rem* are subject to a heightened pleading standard. *See United States v. Aguilar*, 782 F.3d 1101, 1109 (9th Cir. 2015) ("[W]e have held that this is a higher standard than "notice pleading"); 12 Wright & Miller, Fed. Pract. & Proc. § 3242 (3d ed.) (explaining that the supplemental rules applicable to forfeiture actions "require[] a more particularized complaint than is demanded in civil actions generally;" "added specifics [are] thought appropriate because of the drastic nature of th[e] remedies" at issue).

In addition to satisfying Fed. R. Civ. P. 8(a), a federal, *in rem* forfeiture action also must satisfy the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions. *See United States v. Real Prop. Located In Brentwood, California*, No. 15-cv-06794-RGK-AJWX, 2016 WL 11121402, at *2 (C.D. Cal. Mar. 15, 2016) ("In addition to satisfying the court's standards set forth in *Iqbal*, in an *in rem* forfeiture action arising from a federal statute, a court must apply the [supplemental rules], which provide a slightly higher pleading standard."); *United States v. One Gulfstream G-V Jet Aircraft*, 941 F. Supp. 2d 1, 14 (D. D.C. 2013) (requiring "a pleading that is somewhat more exacting than the liberal notice pleading standard contemplated by Rule 8(a)(2)."). Specifically, Supplemental Rule G requires a forfeiture complaint to "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." Supp. R. G(2)(f).

To satisfy this heightened pleading standard, a forfeiture complaint must allege enough facts for claimants to understand the government's forfeiture theories, undertake an adequate investigation, and draft a response to the allegations. *United States v. Aguilar*, 782 F.3d at 1108-09; *United States v. Mondragon*, 313 F.3d 862, 864 (4th Cir. 2002). A complaint also must meet the familiar *Iqbal / Twombly* standards applicable under Rule 8. *Real Prop. Located In Brentwood, Cal.*, 2016 WL 11121402, at *2. "Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Mere "labels and

conclusions" or a "formulaic recitation of the elements of a cause of action will not do." *Id.* The "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).[2]

In evaluating a motion to dismiss, the Court must (1) construe the complaint in the light most favorable to the government, and (2) accept all well-pleaded factual allegations and reasonable inferences therefrom as true. *United States v. $50,040 in U.S. Currency*, No. 06-cv-04552 WHA, 2007 WL 1176631, at *2 (N.D. Cal. Apr. 20, 2007). The Court is limited to the face of the complaint's allegations, judicially noticeable matters, and documents referenced in the complaint so long as their authenticity is not disputed. *Id.* at *1.

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. at 570. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal*, 556 U.S. at 678; *Bell Atl. Corp. v. Twombly*, 550 U.S. at 556. Although allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party (*Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-338 (9th Cir. 1996)), "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim." *Epstein v. Washington Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996). Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. *Balistreri v. Pacifica Police Dep't.*, 901 F.2d 696, 699 (9th Cir. 1988).

---

[2] *See also United States v. $97,667.00 in U.S. Currency*, 538 F. Supp. 2d 1246, 1249 (C.D. Cal. 2007) (applying the *Twombly* / *Iqbal* standard to a forfeiture complaint, stating: "The court is not required to accept as true, however, 'legal conclusions cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged.'") (quoting *Cholla Ready Mix, Inc. v. Civish*, 382 F.3d 969, 973 (9th Cir. 2004); *United States v. Real Prop. Located In Brentwood, Cal.*, 2016 WL 11121402, *2 (applying *Twombly* / *Iqbal* standard to forfeiture action); *United States v. Real Prop.*, No. 18-cv-315-REW, 2021 WL 144245 (E.D. Ky. Jan. 15, 2021) (consistent with *Iqbal*, forfeiture rules require more than "threadbare elemental recital[s] supported by mere conclusory statements").

-7-

ALLEGED GROUNDS FOR FORFEITURE

The Complaint contains a single "claim for relief" essentially alleging, broadly and vaguely, two statutory grounds for forfeiture of the Defendant Funds:

A. International Promotional Money Laundering under 18 U.S.C. § 981(a)(1)(A) as "**property involved in**" international promotional money laundering, an attempt or conspiracy[3] regarding the alleged promotion of the specified unlawful activities ("SUAs") of wire fraud[4] and/or honest services wire fraud[5] (¶¶ 3, 19, 48, 66, 76, 77 and 80); and

B. Proceeds Money Laundering under 18 U.S.C. § 981(a)(1)(C) as "**proceeds traceable to**" the SUAs of money laundering,[6] wire fraud[7] and/or honest services wire fraud,[8] an attempt or a conspiracy (¶¶ 3, 17-18, 68, 76, 81 and 82).

As an alleged factual basis, the Complaint avers that these two forfeiture grounds fall into one or more of three alleged "schemes to defraud":

• **Scheme 1** - The United States alleges that Complainants' defrauded the Commonwealth Casino Commission (the "CCC") by fraudulently misrepresenting to the CCC the scope of Claimants' services to "the Company" (also referred to herein as the "Casino Licensee") for the purpose of avoiding CCC licensing regulations and closer scrutiny by the CCC. Complaint, ¶¶ 33, 46-47. The United States further alleges that "Defendant Funds were transferred in a away that was necessary to and enabled a fraud upon a government regulatory authority" (¶ 77) (emphasis added). More specifically, it alleges that wire transfers of money were made to MCS's account in the CNMI from an account or accounts in Hong Kong with the intent to promote their alleged scheme to defraud the CCC. ¶ 48.

---

[3] 18 U.S.C. §§ 1956(a)(2)(A) and (h)
[4] 18 U.S.C. § 1343 through §§ 1956(c)(7)(A) and 1961(1)
[5] 18 U.S.C. §§ 1346 and 1343 through §§ 1956(c)(7)(A) and 1961(1)
[6] 18 U.S.C. §§ 1956(a)(1)(A), (h) and 1957(a) through §§ 1956(c)(7)(A) and 1961(1)
[7] 18 U.S.C. § 1343 through §§ 1956(c)(7)(A) and 1961(1)
[8] 18 U.S.C. §§ 1346 and 1343 through §§ 1956(c)(7)(A) and 1961(1)

• **Scheme 2** - The United States alleges Honest Services Fraud by Claimants, other unnamed individuals and the Casino Licensee who "devised a scheme . . . [to provide] a stream of benefits to, for, or on behalf of CNMI government officials for the purpose of gaining preferential treatment for the Casino License." Complaint, ¶ 49.

In furtherance of Scheme 2, Claimants allegedly used funds provided by the Casino Licensee for campaign contributions (¶ 50); paid for "overseas trips for CNMI government officials, . . . golf, meals, drinking, and karaoke" (¶ 51); and paid as "consultants" "[several] persons in the CNMI who could influence policy involving the Company" including one person "close to" a "political figure" (¶ 14, 58-60).

The United States also alleges, even more speculatively and implausibly, a supposed connection between Claimants' "frequent cash withdrawals," that allegedly "coincided with" some of the "numerous cash deposits" of two other individuals "or their business" and those unnamed individuals (not public officials) "frequent" payment of "substantial amounts of money" to a particular "political figure" with whom the two are "closely affiliated." ¶¶ 11-13, 56-57.

The United States also refers to the these activities as Claimant Yue "[seeking] to influence [political figures] through unethical gifts." ¶ 62.

With regard to the supposed benefits reaped through these alleged improper payments, the United States claims that, somehow without explanation, "the CNMI government extended the Casino Licensee uniquely favorable treatment" that included (¶ 61):

1. "allowing the Casino Licensee to escape liquidated damages after missing construction deadlines";

2. "extending the Casino Licensee's operation and related deadlines with little or no penalty";

3. "amended regulations to accommodate the Casino Licensee's development schedule"; and

4. "deferred enforcement of tax, labor, and other contractual obligations owed to the CNMI."

The United States cites as "one example of particular importance," in similarly conclusory fashion, that unnamed public figures and "certain officials" supposedly "undermined various efforts to mandate that the Casino Licensee either provide verifiable proof that it was financially capable of completing its construction project, or to at least post a 'completion bond.'" ¶ 62.

Finally, the United States alleges that funds transfers from Hong Kong to Claimants' accounts in the CNMI were "intended to promote" Scheme 2 (¶¶ 66-67) and that the Defendant Funds they now seek to forfeit "were part of and necessary to" Scheme 2 (¶ 77).

• **Scheme 3** - The United States alleges a direct wire fraud violation (§ 1343) — defrauding the CNMI government of tax revenue by falsely claiming business deductions from business income in Claimants' annual income tax filings — with the resulting proceeds of the wire fraud, apparently, being all or part of the Defendant Funds. Complaint, ¶¶ 69-75.

ARGUMENTS FOR DISMISSAL

To state a claim for civil forfeiture, the United States must allege the commission of a predicate criminal offense. Here, the United States fails to allege a predicate criminal offense; thus, it fails to state a civil forfeiture cause of action.

1. **The allegations of Scheme 1 (defrauding the CCC) do not constitute wire fraud nor otherwise constitute international promotional money laundering.**

"The federal wire fraud statute makes it a crime to effect (with use of the wires) 'any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises.'" *Kelly v. United States*, 140 S.Ct. 1565, 1571 (2020) (quoting 18 U.S.C. § 1343). The statute prohibits deceptive schemes intended to deprive a victim of money or property. *Id.* (quoting *McNally v. United States*, 483 U.S. 350, 356 (1987)). The "object" of the deception must be to obtain specific money or property not to more generally "influence government officials" or otherwise interfere with State regulatory functions. *Id.* at 1572 (discussing *Cleveland v. United States*, 531 U.S. 12, 23 (2000) (where the court distinguished between property and regulatory power).

-10-

"[The] property must play more than some bit part in a scheme: It must be an 'object of the fraud.'" *Id*. 1573 (quoting *Pasquantino v. United States*, 544 U.S. 349, 355 (2005)). "[A] property fraud conviction cannot stand when the loss to the victim is only an incidental byproduct of the scheme." *Id*.

In *Cleveland v. United States*, the Supreme Court reversed federal mail fraud convictions of defendants that made false statements when applying for and renewing licenses from Louisiana to operate video poker machines. 531 U.S. at 15. The Court found that the permits and licenses that were the object of the scheme to defraud were not "property" within the purview of 18 U.S.C. § 1341. *Id*. (video poker licenses not property in the hands of the licensor). "It does not suffice ... that the object of the fraud may be come property in the recipient's hands; for purposes of the mail fraud statute, the thing obtained must be property in the hands of the victim." *Id*.

Louisiana's annual video poker licensing requirements were "designed to ensure that licensees have good character and fiscal integrity" and to "assert the State's legitimate interest in providing strict regulation of all persons, practices, associations, and activities related to the operation of . . . establishments licensed to offer video draw poker devices." *Cleveland v. United States*, 531 U.S. at 15, 20-21 (quoting various provisions of the Louisiana licensing statute).[9] The defendants had fraudulently concealed their ownership interests in the poker license applicant in successive annual poker license applications and renewals. *Id*. at 16-17. Those alleged § 1341 mail fraud violations were also the predicate criminal offenses upon which the defendants were indicted for money laundering and RICO violations. *Id*.

---

[9] For comparison, the CCC regulations that are the subject of this alleged scheme were promulgated, among other purposes,"to ensure the suitability and compliance with the legal, statutory and contractual obligations of . . . persons licensed under this chapter" (NMIAC § 175-10.1-105(b)(2)) and "to ensure the good character, honesty, and integrity of [Casino Service Provider licensees] (NMIAC § 175-10.1-1375(g)). *See also* Complaint, ¶ 34 ("The purpose of [CCC regulation of Casino Licensee vendors] is to promote transparency, by subjecting those who engage in significant business activity with the Company to heightened diligence.").

-11-

In holding that the video poker licenses were not "property" within the meaning of § 1341, the Supreme Court noted that "whatever interests Louisiana might be said to have in its video poker licenses, the State's core concern is regulatory." *Cleveland v. United States*, 531 U.S. at 21. The Supreme Court rejected the United States' contention that licensing fees and licensing revenue were property interests out of which Louisiana had been defrauded finding that the fees did not make the licenses "'property' in the hands of the State." *Id*. at 21-22. "Licenses pre-issuance do not generate an ongoing stream of revenue. At most, they entitle the State to collect a processing fee from applicants for new licenses." *Id*. The licenses are "purely regulatory." *Id*.

The Supreme Court also eschewed the United States' argument that Louisiana had a property interest in its "right to control the issuance, renewal, and revocation of video poker licenses." *Id*. at 23. "Even when tied to an expected stream of revenue, the State's right of control does not create a property interest any more than a law licensing liquor sales in a State that levies a sales tax on liquor. Such regulations are paradigmatic exercises of the States' traditional police powers." *Id*.

With regard to Scheme 1, the allegations are indistinguishable from those the Supreme Court rejected in *Cleveland*. Here, the United States alleges as the SUA predicate criminal offense for international promotional money laundering that "the essence of the scheme to defraud was to materially understate the services of [Claimants] to [a Casino Licensee]" and that "the effects of the scheme to defraud were to frustrate the CCC's ability to accomplish its mission of overseeing and regulating the [Casino Licensee's] operations and to deprive the CCC of fees to which it was entitled." Compliant, ¶ 33.

As the *Cleveland* Court held, the right to "more closely regulate" is not "money or property" within the meaning of the federal fraud statutes. *See* 531 U.S. at 23. "Transparency," "heightened diligence" and the CCC's "ability to perform its missions" (¶ 46) are purely regulatory functions, not money or property out of which the CCC can be defrauded in violation of the federal mail and wire fraud statutes.

-12-

Moreover, while the United States alleges that Claimants' deceitful conduct "avoided" annual license fees (¶ 46) and had "the effect of depriving the CCC of fees to which it was entitled." (¶¶ 33, 47), there are no allegations that the object of the alleged scheme to defraud was to avoid the payment of licensing fees. *See Kelly v. United States*, 140 S.Ct. at 1573 (the "property must play more than some bit part in a scheme: It must be an "object of the fraud."). And while Claimants would suggest that such allegations, if they were included, would not be plausible given the other allegations of the Complaint, the Supreme Court's decision in *Cleveland* undoubtedly forecloses that allegation as a basis upon which to anchor a § 1343 wire fraud claim.

In sum, the allegations of the Complaint fail to state a claim for "international promotional money laundering" (18 U.S.C. § 1956(a)(2)(A)) on the basis of § 1343 wire fraud as a predicate criminal offense. Accordingly, there are no grounds under 18 U.S.C. § 981(a)(1)(A) for forfeiture of the Defendant Property based on alleged wire fraud.

Additionally, as argued below, while the United States' theory of the case as it relates to its separate "proceeds money laundering" theory remains elusive, it is likely that it intends to argue that the "international promotional money laundering" theory of Scheme 1 is also the factual and legal basis for its Scheme 2 and Scheme 3 theories to the extent they rely on the *use* of tainted funds in elemental support of "proceeds money laundering" grounds for forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C). However, because the money laundering basis for the Scheme 1 theory is legally untenable, it cannot be the source of any "tainted funds." Accordingly, to the extent that the grounds for forfeiture of the Defendant Property relies on any "tainted funds" from Scheme 1, and their being no other viable allegation of the source of any tainted funds, the "proceeds money laundering" grounds of the Complaint should be dismissed.

2.  **The Complaint fails to allege a "quid pro quo" related to its allegations of "honest services fraud."**

Honest services fraud criminalizes only schemes to defraud that involve bribery or kickbacks. *See Skilling v. United States*, 561 U.S. 358, 408-09 (2010); *Black v. United States*, 561 U.S. 465, 471 (2010). Generally, to prove honest services fraud the government must prove that the defendant engaged in "a scheme or artifice to 'deprive another,' by mail or wire, 'of the intangible right of honest services.'" *United States v. Christensen*, 828 F.3d 763, 784 (9th Cir. 2015) (quoting 18 U.S.C. § 1346; then citing 18 U.S.C. §§ 1341, 1343). However, to prove honest services fraud in the form of bribery as the United States has alleged here, it must plausibly allege and then prove a *quid pro quo. See, e.g., United States v. Inzunza*, 638 F.3d 1006, 1013 (9th Cir. 2011) (citing *United States v. Kincaid-Chauncey*, 556 F.3d 923, 943 (9th Cir. 2009) (imposing a *quid pro quo* requirement where "the government's theory is that a public official accepted money in exchange for influence")).

> [B]ribery requires a *quid pro quo*, which includes an "intent 'to influence' an official act or 'to be influenced' in an official act." This may be contrasted to both a gratuity, which "may constitute merely a reward for some future act that the public official will take (and may already have determined to take), or for a past act that he has already taken," and to a noncriminal gift extended to a public official merely "to build a reservoir of goodwill that might ultimately affect one or more of a multitude of unspecified acts, now and in the future." []. This discussion is equally applicable to bribery in the honest services fraud context, and we thus conclude that bribery requires "a specific intent to give or receive something of value *in exchange* for an official act."

*United States v. Kemp*, 500 F.3d 257, 281 (3rd Cir. 2007) (emphasis in original) (quoting *United States v. Sun-Diamond Groumrs of Cal.*, 526 U.S. 398, 404-05 (1999) (emphasis in original)) (which was cited with approval in *United States v. Kincaid-Chauncey*, 556 F.3d at 943).[10]

---

[10] In a more recent bribery case, the Supreme Court found it appropriate to define honest services fraud with reference to the federal bribery statute itself, 18 U.S.C. § 201:

> That statute makes it a crime for a "public official or person selected to be a public official, directly or indirectly, corruptly" to demand, seek, receive, accept, or agree "to receive or accept anything of value" in return for being "influenced in the performance of any official act." An "official act" is defined as "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be

1    The *quid pro quo* must "be clear and unambiguous, leaving no uncertainty about the terms

2    of the bargain." *United States v. Carpenter*, 961 F.2d 824, 827 (9th Cir. 1992). "The explicitness

3    requirement serves to distinguish between contributions that are given or received with the

4    'anticipation' of official action and contributions that are given or received in exchange for a

5    'promise' of official action. *Id.* (quoting *United States v. Montoya*, 945 F.2d 1068, 1073 (9th Cir.

6    1991) (quoting *McCormick*, 111 S.Ct. at 1818 (Scalia, J., concurring)). "When a contributor and an

7    official clearly understand the terms of a bargain to exchange official action for money, they have

8    moved beyond 'anticipation' and into an arrangement that the Hobbs Act forbids." *United States v.*

9    *Carpenter*, 961 F.2d at 827.

10    Here, the Complaint does not alleged that any particular "official acts" were undertaken by

11    any particular public official that was the direct or indirect beneficiary of any illicit payments for any

12    particular purpose. Instead, the Complaint avers in broad, conclusory terms a scheme to provide "a

13    stream of benefits to, for, or on behalf of CNMI public officials for the purpose of gaining

14    preferential treatment" for the Casino Licensee. While the Complaint piles on more conclusory,

15    non-specific allegations and never actually names a single public official (even the "Doe" individuals

16    of the Complaint are identified only as two "political figures" (¶¶ 13-14)), none of the allegations of

17    the Complaint satisfy the United States' obligation to plead non-conclusory, "sufficiently detailed

18    facts to support a reasonable belief that the government will be able to meet its burden of proof at

19    trial." *See* Rule G(2)(f). None of the following allegations of the Complaint plausibly plead the

20    requisite "clear and unambiguous" *quid pro quo* between Claimants and any particular public official

21    with a fiduciary duty to the CNMI government that was in a position to influence an official act and

22    that explicitly promised to do so in exchange for an illicit payment:

23

24        pending, or which may by law be brought before any public official, in such official's
      official capacity, or in such official's place of trust or profit."

25

26    *United States v. McDonnell*, 136 S. Ct. 2355, 2365 (2016) (quoting 18 U.S.C. § 201).

- ¶ 49 "a stream of benefits to, for, or on behalf of CNMI government officials for the purposes of gaining preferential treatment for the Company";

- ¶ 50 campaign contributions in unknown amounts to "various [unnamed] individual candidates, campaigns, inauguration committees, and political parties –including [but obviously not limited to] Individual 3 and Individual 4 with no alleged promises by an particular official or official acts in exchange;

- ¶ 52 "arranged and at least partially paid for several overseas trips for [unnamed] CNMI government officials (including Individual 4 on at least one occasion)" again with no alleged promises by any particular official to influence official acts in exchange therefor;

- ¶ 52 "frequently met with government officials for golf, drinking, and karaoke" with Claimant Yue "typically" paying the bill, still with no identification of any particular official much less an explicit promise from that official to influence officials acts in exchange for the golf, drinks and karaoke;

- ¶ 58 Claimant Yue "spent money on" unidentified "*persons in the CNMI who could influence policy involving the Casino Licensee*" (emphasis added) with no allegations that any of those persons were officials nor whether any of those persons, if officials, explicitly promised to perform or to influence official acts in exchange for the payments.

Instead of alleging any "official acts" promised by any official in exchange for any of the foregoing "benefits," the Complaint broadly combines all of these supposed "benefits" and alleges they were collectively exchanged for "the CNMI government's" extending the Casino Licensee "uniquely favorable treatment." ¶ 61. Though the Complaint alleges that "Individual 3, Individual 4, and other [unnamed officials]" were "involved in" "the CNMI government" extending that supposedly favorable treatment, there are no allegations of when and how any particular official promised to take or influence, nor actually took or influenced, any official act in furtherance of "the CNMI government" as a whole treating the Casino Licensee more favorably. *Id*.

-16-

The United States' listed "examples" do nothing to impart necessary facts to the Complaint that would plausibly allege a *quid pro quo* involving any particular official receiving an illicit payment in exchange for a promise of "official acts" in exchange therefor.

"Official act" is a term of art defined in the Ninth Circuit as:

> "Official act" means any decision or action on a matter involving the formal exercise of government power. The matter must be pending, or be able by law to be brought, before a public official, and the matter must be something specific and focused, rather than a broad policy objective. The official's action may include using his official position to exert pressure on another official to perform an official act, or to advise another official, knowing or intending that such advice will form the basis for an official act by another official. Merely arranging a meeting, hosting an even, or giving a speech, do not qualify as taking of a specific action.

*Manual of Modern Criminal Jury Instructions for the District Courts of the Ninth Circuit* § 10.34 (2021) (in relevant part). *See also* 18 U.S.C. § 201(a)(3).

Here, there are no allegations connecting any particular official to any decision the "CNMI government" made or did not make in relation to the Casino Licensee regardless of whether those decisions were or could have been "favorable" to it as the United States alleges. The closest the Complaint gets to even a marginally "specific" allegation of official influence, while still conclusory and inadequate, alleges only that Individual 3, Individual 4 and certain other unnamed officials "undermined various efforts" by some unidentified actor to "mandate" construction project assurances through some unidentified mechanism with no allegations of what any particular official did in furtherance of the undermining nor whether the allegedly undermined construction assurances was the result of an "official act." *See* Complaint, ¶ 62. Very little, if any, of the best read portions of that allegation satisfy even one of the several facts necessary to meet the Ninth Circuit's definition of an "official act" much less that plausibly plead a "clear and unambiguous" promise by an official to perform an "official act" to in exchange for bribe money.

Even the best reading of the completely speculative and conclusory insinuations of ¶¶ 56-57 — that Claimant Yue delivered cash to two individuals "closely affiliated with Individual 3" who would in turn include that alleged cash in larger amounts of money they would frequently give to

-17-

1    Individual 3 — fails to identify Individual 3 as a public official that explicitly promised any "official
2    acts" again, regardless of whether any alleged "favoritism" — the vague and conclusory goal of the
3    illicit payments — could possibly have benefitted Claimants, the Casino Licensee and/or any other
4    would-be co-conspirators in exchange for the supposed cash payments.

5           Essentially, the Complaint is devoid of any specific allegations of the terms of an illicit
6    bargain. The United States' allegations are, at most, a perverse recharacterization of money that
7    Claimants used to develop general good within the community as a whole towards the Casino
8    Licensee and its "controversial" business plan.

9           There are simply no plausible allegations in the Complaint identifying any public officials,
10   nor their positions, nor their receipt of influence money, nor of any agreement by an specific public
11   official to take or to influence any "official act" in exchange for campaign contributions and
12   "unethical gifts" to the public official, his or her family, associates, campaign or political party.  It is
13   not enough for the United States to plead only that several unnamed public officials, directly or
14   indirectly, received illegal contributions and gifts and that these unnamed public officials may or may
15   not have had some unspecified influence over some unidentified public agency in a position to
16   provide non-specific "preferential treatment."

17          In sum, the Complaint fails to make out a prima facie case for honest services wire fraud and,
18   without the SUA of the § 1346 violation, the allegations of the Complaint fail to state a claim for
19   "international promotional money laundering" (18 U.S.C. § 1956(a)(2)(A)) on the basis of that
20   predicate criminal offense.

21          As with the alleged predicate criminal offense of defrauding the CCC of their regulatory
22   authority, there are no grounds under 18 U.S.C. § 981(a)(1)(A) for forfeiture of the Defendant
23   Property based on "international promotional money laundering." Accordingly, to the extent the §
24   981(a)(1)(A) forfeiture claim is based on the allegations of Scheme 1 and/or Scheme 2, that forfeiture
25   claim must be dismissed.

26

-18-

**3. The Complaint fails to allege wire fraud related to Scheme 3 (tax evasion).**

Through Scheme 3, the Complaint alleges a direct wire fraud offense the proceeds of which are forfeitable pursuant to 18 U.S.C. § 981(a)(1)(C). Complaint, ¶ 69. To prove the predicate wire fraud offense, the government must show that the defendant "knowingly engaged in a scheme or plan to defraud or obtain money or property by means of false or fraudulent pretenses, representations, or promises." *United States v. Miller*, 953 F.3d 1095, 1103 (9th Cir. 2020). "[T]he crime of wire fraud requires the specific intent to utilize deception to deprive the victim of money or property, *i.e.*, to cheat the victim." *Id.* at 1099.

The United States must also plead and prove the jurisdictional element that the scheme to fraud was carried out with the use of wire communications in interstate or foreign commerce. *See, e.g.*, *United States v. Garlick*, 240 F.3d 789, 792 (9th Cir. 2001) ("[c]ourts have consistently construed Congress' intent behind the mail fraud statute broadly, focusing on the use of the mails itself, not on the underlying scheme or a particular fraud victim."). "'The focus of [the mail and wire fraud statutes] is upon the misuse of the instrumentality of communication." *Id.* at 792 (quoting *United States v. Alston*, 609 F.2d 531, 536 (D.C. Cir. 1979)). "[I]t is the use of the mails for purpose of executing the scheme which gives the federal courts jurisdiction over the offense." *Id.* (quoting *Mitchell v. United States*, 142 F.2d 480, 481 (10th Cir. 1944)).

Additionally, "foreign commerce" is a term of art which means "commerce with a foreign country." 18 U.S.C. § 10. The use of a wire to transfer money occurring between foreign countries is not criminalized by the wire fraud statute. *See, e.g.*, *United States v. Weingarten*, 632 F.3d 60, 70-71 and n.3 (2nd Cir. 2011) (discussing transportation "in foreign commerce" in an analogous context of sex trafficking between two foreign countries finding that, absent a "territorial nexus to the United States," "foreign commerce" means between the United States and a foreign country (various citations omitted)).

-19-

Here, the Complaint fails to allege the jurisdictional element of a wire communication in interstate or foreign commerce. The only wire allegations of the Complaint regarding Scheme 3 are the wholly conclusory allegations that:

- Claimant Yue and others "transmitted and caused to be transmitted electronic signals in the course of [the alleged scheme to defraud the CNMI of tax revenue]" (¶ 69);

- "The Company reimbursed [Claimant Yue] . . . by sending the money *directly* from one foreign bank account to another foreign bank account" (¶ 72) (emphasis added); and

- "The Foreign Parent Company wire-transferred . . . [reimbursement funds] to [Claimant Yue's] Bank of China account . . . [and the] transfers did not transit any U.S. bank account or company . . . ." (¶ 73).

The Complaint is also devoid of any plausible allegations that any part of the Defendant Funds represent the "proceeds" of the alleged wire fraud violation and, thus, subject to forfeiture. To the contrary, as quoted above, the United States alleges that reimbursement transfers to Claimant Yue that avoided taxation by the CNMI were sent "directly from one foreign bank account to another foreign bank account." Complaint ¶ 72. *See also* ¶ 73 (reimbursement funds "did not transit any U.S. bank account or company."). Regardless of the jurisdiction defect with regard to the wire fraud predicate offense and the efficacy, otherwise, of the United States' tax avoidance theory of wire fraud, it is not alleged and it cannot be proven that any of the Defendant Funds are the proceeds of any fraudulent avoidance of CNMI taxation on funds allegedly spent and later reimbursed with separate funds from one foreign account to another foreign account.

Also, the common-law "revenue rule" arguably applies to this case. *Cf. Pasquantino v. United States*, 544 U.S. 349, 361 (2005) (in a *prosecution* for a wire fraud offense, 18 U.S.C. § 1343 does not derogate from the "well-established revenue rule principal"). The common-law revenue rule, "at its core" prohibits "the collection of tax obligations of foreign nations." *Id*. The *Pasquantino* Court found the prosecution of a customs tax fraud on Canada different from the "classic examples of

-20-

actions traditionally barred by the revenue rule." *Id.* at 362. That case was the United States enforcing its own penal laws "not a suit that recovers a foreign tax liability, like a suit to enforce a judgment." *Id.* ("This is a criminal prosecution by the United States in its sovereign capacity to punish domestic criminal conduct.").

Here, however, the United States is not prosecuting a criminal violation of 18 U.S.C. § 1343, but seeking to collect, by civil forfeiture, what it alleges is Claimants' tax liability to the CNMI. Claimants submit that the nature of this case falls squarely within the prohibition of the otherwise time honored common-law revenue rule.

In sum, the United States cannot make out a claim for forfeiture grounded on the allegations of Scheme 3 with wire fraud as the predicate offense because: (1) there was no wire communication in interstate or foreign commerce, (2) no part of the Defendant Funds are "proceeds" of or otherwise traceable to Scheme 3, and (3) the civil forfeiture proceeding to collect Claimants' alleged tax liability to the CNMI is barred by the common-law revenue rule. Accordingly, the United States' claim of forfeiture based on Scheme 3 must be dismissed.

**4. There are no plausible "proceeds" allegations to support forfeiture based on 18 U.S.C. § 981(a)(1)(C) ("proceeds money laundering").**

In order to show "proceeds money laundering," 18 U.S.C. § 1956(a)(1)(A) requires the government to prove that a defendant participated in or attempted to participate in a financial transaction knowingly involving the "proceeds" of an SUA with the intent to promote or further an SUA. *See, e.g., United States v. Ali*, 620 F.3d 1062, 1071 (9th Cir. 2010) (reversing promotion money laundering convictions because the government failed to specifically show that profits from the fraudulent scheme were used in furtherance of the defendants' continuing fraudulent scheme). "Promotional money laundering[11] is 'different from traditional money laundering because the

---

[11] Referred to herein as "proceeds money laundering" for clarity in order to distinguish it conceptually from both "international promotional money laundering" which is based on different subsections of 18 U.S.C. § 1956 (and already tainted funds that re the subject of 18 U.S.C. § 1957).

1  criminalized act is the reinvestment of illegal proceeds rather than the concealment of those

2  proceeds.'" *United States v. Wilkes*, 662 F.3d 524, 545 (9th Cir. 2011) (quoting *United States v. Jolivet*,

3  224 F.3d 902, 909 (8th Cir. 2000)).

4          Here, however, none of the United States' factual contentions with regard to any of their three

5  alleged "schemes" actually involved the *proceeds*, in whole or in part, of specified unlawful activity.

6  Moreover, the few references to "proceeds" that are actually found in the allegations of the

7  Complaint are wholly conclusory and untethered to any particular theory the United States may

8  intend to argue underlies its amalgamous forfeiture claim. *See, e.g.*, Complaint ¶ 3 ("the second

9  scheme involved . . . transacting in criminal proceeds"), ¶ 4 (Defendant Funds were "proceeds of the

10 crimes"), ¶ 17 (Defendant Funds "constitute or were derived from proceeds traceable to . . . wire

11 fraud"), ¶ 18 (simply quotes the definition of "proceeds" in § 981(a)(2)(A)), ¶ 19 (merely cites the

12 title of 18 U.S.C. §1957), ¶ 68 (alleges in conclusory fashion that "some of the funds transferred from

13 Account 1 to Account 2 consisted of . . . proceeds of the honest services fraud scheme"), and ¶ 81

14 ("Defendant Properties constitute or are derived from proceeds traceable to [money laundering

15 and/or wire fraud].").

16         Additionally, the Complaint insufficiently alleges that any tainted funds were, in fact, the

17 "proceeds" used to promote money laundering as opposed to the mix of internationally wired funds

18 sent for various purposes, none of which are or can be attributed to the use of tainted funds from any

19 articuable "scheme to defraud." *See, e.g., United States v. Ali*, at 1072 (9th Cir. 2010); *United States*

20 *v. Wilkes*, 662 F.3d 524, 545 (9th Cir. 2011) ("transactions that create the criminally-derived proceeds

21 must be distinct from the money laundering transaction because money laundering criminalizes a

22 transaction in proceeds not the transaction that creates the proceeds." (Citations omitted.)).

23         Assuming, arguendo, that the United States' theory is that the *international* wire transfer of

24 funds *to promote* an SUA (§ 981(a)(1)(A) by a violation of 1956(a)(2)(A)) makes those

25 internationally transferred funds "proceeds" of the violation of the SUA itself, the allegations of the

26

Complaint are still legally insufficient to support a "domestic" promotional money laundering theory of forfeiture, i.e., "proceeds money laundering."

First, as detailed above, the alleged scheme to defraud the CCC (Scheme 1) does not constitute international promotional money laundering under 18 U.S.C. §§ 981(a)(1)(A) and 1956(a)(2)(A). That being the case, none of the funds sent by international wire pursuant to Scheme 1 can be classified as tainted funds, i.e., "proceeds" of some other money laundering or wire fraud SUA. Accordingly, Scheme 1 does not provide grounds for forfeiture based on proceeds money laundering.

Second, even if there is any legal merit to the United States' honest services fraud allegations (Scheme 2), the international wire transfers allegedly intended to promote that scheme (or any SUA) were not, themselves, proceeds of the honest services fraud they were intended to promote and the United States has not alleged any other basis upon which to characterize the funds as "proceeds" of some SUA. Accordingly, Scheme 2 also does not provide grounds for forfeiture based on proceeds money laundering.

Finally, with regard to alleged tax evasion scheme to defraud (Scheme 3), the allegations of the Complaint are that funds in MCS' two CNMI bank accounts were expended (¶¶ 31, 74) and then reimbursed from a foreign account in Hong Kong to a foreign account of Claimant Yue in China (¶¶ 30, 72, 73). Regardless of the efficacy of the allegations of fraudulent tax filings with the CNMI government, it cannot be said that any of the Defendant Funds — funds in the CNMI accounts — were *proceeds* of any tax fraud. The proceeds — presumably a marginal percentage of the reimbursed expenses that were not included as income in Claimant Yue's income taxes — would be a part of the funds paid in China not any part of the Defendant Funds the United States wrongly seeks to forfeit.

In sum, there are no tenable allegations in the Complaint that any *proceeds* of money laundering or any SUA were used in a scheme to perpetrate another SUA. Accordingly, the Court must dismiss all of the United States' forfeiture grounds based on 18 U.S.C. § 981(a)(1)(C) and/or

-23-

§ 981(a)(1)(A) claiming violations of §§ 1956(a)(1)(A) or 1957.

CONCLUSION

In most favorable light, with all reasonable inferences drawn in favor of the United States, its Complaint fails to plead plausible grounds on which the Court could order forfeiture of any of the Defendant Funds. The Complaint must be dismissed.

Respectfully submitted this 21st day of April, 2023.

/s/ Mark B. Hanson

MARK B. HANSON

Second Floor, Macaranas Building
Beach Road, Garapan
PMB 738 P.O. Box 10,000
Saipan, N. Mariana Islands 96950
Telephone:     (670) 233-8600
Facsimile:     (670) 233-5262
E-mail:        markbhanson@gmail.com

Attorney for *Claimants Marianas Consultancy Services, LLC and Alfred Yue*

CERTIFICATE OF SERVICE

I certify that the following were served with a copy of the foregoing via the Court's Case Management/Electronic Filing System:

Mikel Schwab, AUSA (mikel.schwab@usdoj.gov)
Jessica F. Wessling, AUSA (Jessica.F.Cruz@usdoj.gov)
Eric S. O'Malley, AUSA (Eric.O'Malley@usdoj.gov)
UNITED STATES ATTORNEY'S OFFICE
4 Sirena Plaza, Suite 500
108 Hernan Cortez Avenue
Hagâtna, Guam 96910

April 21, 2023                    /s/ Mark B. Hanson
DATED: _____         _____
                                       MARK B. HANSON