SHAWN N. ANDERSON
United States Attorney
MIKEL W. SCHWAB
JESSICA F. WESSLING
ERIC S. O'MALLEY
Assistant U.S. Attorneys
Sirena Plaza, Suite 500
108 Hernan Cortez Avenue
Hagåtña, Guam 96910
TEL:   (671) 472-7332
FAX:   (671) 472-7215

Attorneys for the United States of America

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN MARIANA ISLANDS

| UNITED STATES OF AMERICA, | Civil Case No. 22-CV-00020 |
|---|---|
| Plaintiff, | |
| vs. | **UNITED STATES' OPPOSITION TO MOTION TO DISMISS VERIFIED COMPLAINT FOR FORFEITURE IN REM** |
| $271,087.88 IN U.S. CURRENCY SEIZED FROM BANK OF SAIPAN ACCOUNT NO. ENDING IN LAST FOUR DIGITS 0157, HELD IN THE NAME OF "MCS"; | |
| and | |
| $39,188.38 IN U.S. CURRENCY SEIZED FROM BANK OF SAIPAN ACCOUNT NO. ENDING IN LAST FOUR DIGITS 2098, HELD IN THE NAME OF "MCS"; | |
| Defendants. | |

**TABLE OF CONTENTS**

I.   OVERVIEW ............................................................................................................. 1
II.  BACKGROUND ..................................................................................................... 1
III. LEGAL STANDARD .............................................................................................. 4
IV.  ARGUMENT ........................................................................................................... 5
   A. The Objective of the First Scheme Is to Deprive the Commonwealth Casino Commission of Money or Property. ................................................... 5
   B. The Second Scheme Sufficiently Describes Official Acts and a *Quid Pro Quo*. ....... 8
   C. The Third Scheme Involved Domestic Wire Communications. ............................... 13
   D. The Common Law "Revenue Rule" Does Not Apply. ............................................. 13
   E. The Complaint Alleges Predicate Offenses that Support both Proceeds and Promotional Money Laundering. ................................................. 15
V.   CONCLUSION ...................................................................................................... 16

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................................ 4, 8

*Bell Atlantic Corp. v. Twonbly*, 550 U.S. 544 (2007) .......................................................... 4, 8

*Cleveland v. United States*, 531 U.S. 12 (2000) .......................................................... 5, 6, 7, 8

*Conley v. Gibson*, 355 U.S. 41 (1957) ....................................................................................... 4

*Epstein v. Wash. Energy Co.*, 83 F.3d 1136 (9th Cir. 1996) ..................................................... 4

*Fountain v. United States*, 357 F.3d 250 (2d Cir. 2004) ........................................................... 6

*Funds in the Amount of Thirty Thousand Sixty Hundred Seventy Dollars*,
    403 F.3d 448 (7th Cir. 2005) ................................................................................................. 9

*Her Majesty the Queen In Right Of the Province of British Columbia v. Gilbertson*,
    597 F.2d 1161 (9th Cir. 1979) ............................................................................................. 14

*Kelly v. United States*, 140 S.Ct. 1565 (2020) .......................................................................... 6

*McDonnell v. United States*, 579 U.S. 550 (2016) .................................................................. 10

*Navarro v. Block*, 250 F.3d 729 (9th Cir. 2001) ....................................................................... 4

*Pasquantino v. United States*, 544 U.S. 349, (2005) ..................................................... 6, 7, 8, 14

*Sprewell v. Golden State Warriors*, 266 F.3d 979 (9th Cir. 2001) ........................................... 4

*United States v. $97,667.00 in U.S. Currency*, 538 F. Supp. 2d 1246 (C.D. Cal. 2007) ........ 10

*United States v. Aguilar*, 782 F.3d 1011 (9th Cir. 2015) ............................................... 5, 9, 15

*United States v. Ali*, 620 F.3d 1062 (9th Cir. 2010) ................................................................. 7

*United States v. Arthur*, 544 F.2d 730 (4th Cir. 1976) ........................................................... 11

*United States v. Funds in the Amount of $246,197.44 Seized from JP Morgan Chase Bank*
    *Account XXXXX9895*, No. 14 CV 01570, 2015 WL 1943346 (N.D. Ill., Apr 29, 2015) ... 11, 12

*United States v. Hird*, 913 F.3d 332 (3d Cir. 2019) .............................................................. 7, 8

*United States v. Hoffman*, 901 F.3d 523 (5th Cir. 2018) .......................................................... 7

*United States v. Hossain*, 972 F.3d 1138 (9th Cir. 2020) ....................................................... 13

*United States v. Kincaid-Chauncey*, 556 F.3d 923 (9th Cir. 2009) ........................................ 10

*United States v. Louper-Morris*, 672 F.3d 539 (8th Cir. 2012) ................................................ 7

*United States v. Real Prop. Located at 5208 Los Franciscos Way*, *Los Angeles, Cal.*,
    *APN: 5588-021-018*, 385 F.3d 1187 (9th Cir. 2004) ........................................................... 5

*United States v. Real Property Known as 223 Spring Water Lane, Knoxville,*
   *Knox County, Tennesee*, No. 6:18-CV-315-REW, 2021 WL 144245 (E.D. Ky. Jan. 15, 2021) 9
*United States v. Reichberg*, 5 F.4th 233 (2d Cir. 2021) .............................................................. 10
*United States v. Two Condominiums Located at 465 Ocean Drive, United 315 and 316,*
   *Miami Beach, Fla. 33139*, No. 21-cv-04060-CRB, 2021 WL 3810273 (N.D.Ca.  Aug 26,
   2021) ........................................................................................................................................ 9, 12

**Statutes**
18 U.S.C. § 981 ............................................................................................................................. 11
18 U.S.C. § 983 ......................................................................................................................... 5, 11
18 U.S.C. § 1343 ........................................................................................................................... 18
18 U.S.C. § 1346 ........................................................................................................................... 18
18 U.S.C. § 1349 ........................................................................................................................... 18
18 U.S.C. § 1956 ........................................................................................................................... 18
18 U.S.C. § 1957 ........................................................................................................................... 18
Civil Asset Forfeiture Reform Act of 2000 .................................................................................... 5

**Rules**
Fed. R. Civ. P. 12(b)(6) ............................................................................................................... 1, 4
Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions G(1) ......... 4
Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions G(2) ... 5, 10
Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions G(8) ......... 5

Plaintiff, United States of America, by and through its undersigned counsel, hereby submits its opposition to the Motion to Dismiss Verified Complaint for Forfeiture *In Rem*, ECF No. 16, filed by MCS, and A.Y. (hereinafter, "Claimants"). Claimants seek dismissal of the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), asserting Complaint fails to "allege any viable predicate criminal offense that would provide grounds to forfeit the defendant propert[ies]. . . ." ECF No. 16 at 1. For the reasons stated below, their Motion should be denied.

## I. OVERVIEW

Claimants argue that: (a) the allegations described as the Scheme to defraud the Commonwealth Casino Commission ("First Scheme") fail to state a colorable claim because the purpose of the scheme was not to obtain money or property that belonged to the victim, as Supreme Court precedents have required for federal wire fraud charges; (b) the Complaint fails to describe "official acts" with sufficient particularity in regards to the scheme described as the Scheme to deprive the people of the CNMI of the intangible right to honest services ("Second Scheme"), which depends on proving a *quid pro quo* under a "deprivation of honest services" theory of wire fraud; (c) the allegations described as Scheme to defraud the government of the CNMI ("Third Scheme") are defective because the wires involved did not occur in the United States, the funds involved were not connected to the alleged fraud, and the common law "revenue rule" bars federal forfeiture. Finally, because the Complaint's fraud allegations are defective, so too are the money laundering charges. The Government counters that Claimants misread the precedents on which their arguments depend and that the Complaint is otherwise sufficient under the liberal pleading standards that apply to civil forfeitures.

## II. BACKGROUND

The factual background, briefly summarized below, is fully set forth in the Verified Complaint for Forfeiture *In Rem* against Defendant $271,087.88 in U.S. Currency Seized from

Bank of Saipan Account No. Ending in Last Four Digits 0157, Held in the Name of "MCS" and Defendant $39,188.38 in U.S. Currency Seized from Bank of Saipan Account No. Ending in Last Four Digits 2098, Held in the Name of "MCS" (collectively, "Defendant Funds"). *See* ECF No. 1.

Starting in 2013, the Company[1] began courting CNMI political figures with lavish trips, which was followed by the passage of a bill that enabled an exclusive gaming license in the CNMI. *Id*. at 5. The Company then began sending payments to A.Y. and MCS. *Id*. at 6. The Company was subsequently awarded the exclusive license. *Id*.

Between 2015 and 2018, the Company's Domestic Subsidiary Company, MCS and A.Y. entered into agreements for MCS and A.Y. to be paid for "consulting" services, with each iteration of the agreement increasing the payments to MCS and A.Y. *Id.* at 7. The final agreement in 2018 paid A.Y. $23,000 U.S. dollars per month, plus costs and expenses. *Id*. However, the funds funneled from the Company to MCS and A.Y. far exceeded these amounts, reimbursements frequently lacked pre-approval and documentation, and the services rendered exceeded the bounds of legitimate consulting and lobbying activities. *Id*. at 7-8. From about 2018 to 2019, the Company transferred more than $2,000,000.00 via monthly check deposits and wire transfers to MCS's accounts in the CNMI and A.Y.'s account in China. *Id*. at 8.

A.Y. was required by CNMI law to obtain a license from the Commonwealth Casino Commission ("CCC") when providing services to the Company that exceeded $100,000.00 annually (the threshold was raised in 2017 to $250,000.00 annually). *Id.* at 9. The application process required a $5,000.00 application fee, a $5,000.00 biannual renewal fee, and completion of an application and investigation. *Id*. By limiting the information A.Y. and MCS provided to the CCC, A.Y. and MCS misrepresented the source of the funds (the Company) and the actual payment

---

[1] The abbreviations in this Opposition follow the abbreviations set forth in the "Relevant Names and Entities" section of the Verified Complaint. *See* ECF No. 1 at 4-5.

amounts ($34,000 *per month*) to avoid having to pay for and obtain a CCC license (2014, 2016, and 2018) and to prevent oversight by the CCC. *Id*. at 10.

Further, from 2014 to 2019, A.Y. and MCS used the funds from the Company to make political contributions to individuals, campaigns, inauguration committees, and political parties, which often went undisclosed. *Id*. at 12. A.Y. and MCS used (or were reimbursed with) the Company's funds to treat CNMI government officials to extravagant overseas trips, golf, meals, cocktails, and karaoke – which were benignly described as "business" and "other" expenses on A.Y.'s CNMI tax filings. *Id*. at 12-13. Similarly, during this same period, frequent $1,000 cash withdrawals from MCS accounts coincided with A.Y.'s in-person visits with Individuals 1 and 2 (who is closely affiliated with Individual 3, an influential politician), cash deposits in increments of $1,000 into Individual 1 and 2's accounts, and large sums of money going from Individuals 1 and 2 to Individual 3. *Id.* at 13. Further, $320,000.00 of the funds in MCS's accounts, which originated from the Company, were used to pay individuals who could influence policy pertinent to the Company under the guise of "legal and professional fees" – but in reality those individuals provided little-to-no work to MCS. *Id.* at 13-14. Importantly, the Company, MCS and A.Y. intentionally structured these payments through wire-transfers into A.Y.'s Bank of China account to conceal these payments from the CNMI revenue collectors and to avoid reporting the payments to federal regulators and on MCS and A.Y.'s tax returns. *Id.* at 16-17.

As a result of these efforts, the Company received from the CNMI government extraordinary levels of favorable treatment, including escaping liquidated damages after missing construction deadlines, receiving operation and related extensions with little to no penalties, amending regulations to accommodate the convenience of the Company's development schedule, deferring financial, labor and other contractual obligations the Company owed to the CNMI, and, most notably, being released from posting a completion bond that would have at least partially

compensated the CNMI for its failure to complete its project. *Id*. at 14.

III. **LEGAL STANDARD**

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims alleged in the complaint. *Navarro v. Block*, 250 F.3d 729, 731 (9th Cir. 2001). All material allegations of the complaint are taken as true and construed in the light most favorable to the nonmoving party. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). "A complaint should not be dismissed 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Bell Atlantic Corp. v. Twonbly*, 550 U.S. 544, 546 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). However, it is insufficient to defeat a motion to dismiss with only conclusory allegations of law and unwarranted inferences. *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996). In considering a Rule 12(b)(6) motion, the court determines whether the claim has "facial plausibility" based on whether the complaint pleads facts sufficient for the court to draw a "reasonable inference that the defendant is liable for the alleged misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted).

The procedure requirements for a civil forfeiture action are governed by the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), codified primarily at 18 U.S.C. § 983 and the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supplemental Rules"). On December 1, 2006, Supplemental Rule G was adopted, governing any "forfeiture action in rem arising from a federal statute." Suppl. R. G(1). It provides that a complaint in a civil forfeiture action must:

    a. be verified;
    b. state the grounds for subject-matter jurisdiction, in rem jurisdiction over the defendant property, and venue;
    c. describe the property with reasonable particularity;

4

    d. if the property is tangle, state its location when any seizure occurred and – if different – its location when the action is filed;
    e. identify the statute under which the forfeiture action is brought; and
    f. state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial.

Suppl. R. G(2). Nevertheless, a complaint cannot be dismissed due to a lack of evidence at the time the complaint was filed to establish the forfeitability of the property. Suppl. R. G(8); 18 U.S.C. § 983(a)(3)(D); *$3,063.00*, 2011 WL 2184182, *2. "[T]he government may use evidence gathered after the filing of a complaint for forfeiture" to meet its burden. 18 U.S.C. § 983(c)(2).

        The standard set forth in Supplemental Rule G(2)(f) for the government to set forth facts to support a "reasonable belief" that it will be able to meet its burden of proof at trial is not an onerous one. *United States v. Aguilar*, 782 F.3d 1011, 1108 (9th Cir. 2015) (noting that Supplemental Rule G(2)(f) is intended to carry on forfeiture case law interpreting its predecessor, Supplemental Rule E(2)(a), without change). The Ninth Circuit has held that Supplemental Rule G(2)(f) requires a complaint to "state[] the circumstances giving rise to the forfeiture claim with sufficient particularity that [the claimant] [can] commence[] a meaningful investigation of the facts and draft[] a responsive pleading' and 'permit a reasonable belief for pleading purposes that [the property in question] . . . [is] subject to forfeiture.'" *Aguilar*, 782 F.3d at 1108-09. Although this is a higher standard that "notice pleading," it is still a low bar. *See id.* at 1109. The government "is not required to prove its case simply to get in the courthouse door." *United States v. Real Prop. Located at 5208 Los Franciscos Way, Los Angeles, Cal., APN: 5588-021-018,* 385 F.3d 1187, 1193 (9th Cir. 2004).

IV.    **ARGUMENT**

    **A. The Objective of the First Scheme Is to Deprive the Commonwealth Casino Commission of Money or Property.**

        Claimants' first argument relies on *Cleveland v. United States*, 531 U.S. 12 (2000) and

5

*Kelly v. United States*, 140 S.Ct. 1565 (2020), two Supreme Court cases that limited how federal mail and wire fraud statutes can be used. However, there are factual differences between those cases and this case, which Claimants overlook and that render their precedents inapplicable. Both *Cleveland* and *Kelly* found it significant that the schemes did not include depriving the government (the states of Louisiana and New Jersey respectively) of money as a core objective. The Court in *Cleveland* said "[t]ellingly, the Government does not allege that Cleveland defrauded [the state] of any money to which it was entitled by law." *Cleveland*, 531 U.S. at 13. Because Louisiana had received all of the fees and other revenue to which it was lawfully entitled, the nature of any property of which Louisiana was defrauded "cannot be economic." *Id*. Likewise in *Kelly*, the cost incurred by New Jersey as part of an act of political retribution was merely an "incidental byproduct" of the scheme, not a core objective. *Kelly*, 140 S.Ct. at 1573.

The opposite is true in this case. As the Complaint repeatedly describes, a part of this scheme was to avoid paying the CCC the $5,000 non-refundable application fee and the $5,000 bi-annual renewal fees to which it was lawfully entitled. This legal obligation began the moment A.Y. knew that MCS's business dealings with the Company would exceed the statutory threshold for licensure ($100,000 from 2014 to 2016 and $250,000 from 2017 forward). Therefore, unlike *Kelly* and *Cleveland*, the $5,000 fees in this case were not "some bit part" but were an "object of the fraud," as alleged in paragraphs 33, 36, 46, 47 of the Complaint. ECF Nos. 1, at 8, 9 and 11.

The facts of this case are more analogous to a Supreme Court case that Claimants cite but do not examine. In *Pasquantino v. United States*, 544 U.S. 349, 355-56 (2005) the Court determined that a government's right to collect taxes constitutes "'property' in its hands" for purposes of mail and wire fraud. *Pasquantino* dealt with excise taxes owed to government of Canada, but courts have applied the concept to other taxes and obligations owed to state governments. *See Fountain v. United States*, 357 F.3d 250, 260 (2d Cir. 2004) (taxes owed to state

6

and federal government are "property" for purposes of mail and wire fraud); *United States v. Louper-Morris*, 672 F.3d 539, 557 (8th Cir. 2012) (upholding wire fraud scheme to deprive state of tax revenue); *United States v. Hoffman*, 901 F.3d 523, 537 (5th Cir. 2018) ("tax credits can also be the object of a scheme to defraud."); *United States v. Hird*, 913 F.3d 332, 344-45 (3d Cir. 2019) (depriving government of potential to collect fines for traffic violations can be basis for wire fraud). The facts here are also more analogous to private fraud schemes where a defendant lies in an effort to avoid paying a higher rate. *See United States v. Ali*, 620 F.3d 1062, 1067 (9th Cir. 2010) (upholding fraud convictions based on defendants' lies about their eligibility to buy discounted software because the seller "had a right to full payment [] and was deprived of that right when Defendants fraudulently obtained the software for less than full payment."). . Here, the CCC had a right to the full payment of the $5,000 fees, but A.Y. evaded that payment by structuring his income streams in such a way (using the MCS accounts) that the CCC would only know about a fraction of those proceeds. As a result, every dollar that MCS made from the Company that was over the threshold amount was an unlicensed and illegal proceed.

The *Cleveland* court established that the fees to which Louisiana was entitled as part of the application process was not sufficient to create a property interest in the prospective license itself. However, by stressing that the government never alleged the defendants sought to avoid paying application fees—because they were all paid—it allowed that a scheme to avoid paying such fees would be valid. And that is precisely what the Complaint here alleges: that an object of the scheme was to avoid paying the CCC the fees to which it was lawfully entitled. [2]

The Third Circuit in *Hird* compares *Cleveland's* ruling that licenses are regulatory, having to do with the exercise of a state's police powers; *Pasquantino's* ruling that involved a sovereign's

---

[2] Claimants quibble with semantics over the Government's use of the word "effect" as opposed to "object" (ECF No. 16 at 13), but taken in the context of the entire Complaint, a reader would reasonably infer and understand that the Government alleged that fee avoidance was an object of the scheme.

authority to tax; and *Hird*, which involved the judiciary's power to levy and collect traffic fines. The *Hird* court acknowledged *Cleveland's* precedent that states do not have a property interest in unissued regulatory licenses, because they are regulatory (even if accompanied by an application fee). It found, however, that potential traffic fines (even if not yet imposed) are an 'entitlement to collect something of value' more readily equated to *Pasquantino*'s tax obligations than to *Cleveland's* regulatory license. The *Hird* court parses distinctions between regulatory, taxation, and judicial government functions, but the bottom line: it <u>does</u> <u>not</u> <u>say</u>, or even suggest, that fees paid as part of an application for a regulatory license <u>are</u> <u>not</u> a "property interest" of a state. It instead concludes "a scheme to obviate judgments imposing fines, effectively preventing the Government from holding and collecting on such judgments imposes an economic injury that is the equivalent of unlawfully taking money from the fines paid out of the Government's accounts." *Hird*, 913 F.3d at 339-345.

Thus, the operative question is not whether it was a tax, a judicial fine, or a regulatory fee, but whether it was money that A.Y. and MCS owed to the CCC. In this case, the Complaint alleges that an object of scheme was to deprive the CCC of money to which it was legally entitled. It thus articulates a valid predicate offense for international promotional money laundering. Accordingly, the forfeiture allegations set forth in the First Scheme must stand.

### B. The Second Scheme Sufficiently Describes Official Acts and a *Quid Pro Quo*.

Generally speaking, a complaint merely has to "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. at 678. Complaints should not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff is unable to prove any set of facts which would entitle the plaintiff to relief." *Bell Atlantic Corp. v. Twombly*, 550 U.S. at 546.

In the context of an *in rem* forfeiture, complaints must describe "the circumstances from

8

which the claim arises with such particularity that the defendant or claimant will be able, without moving for a more definite statement, to commence an investigation of the facts and to frame a responsive pleading." *Aguilar*, 782 F.3d at 1108.  Although it is a higher standard than notice pleading, it nonetheless remains a "low bar." *Id.* at 1109.  Complaints must state facts that are detailed enough to support a reasonable belief that the government *will be able* to establish that the relevant property was involved in, or traceable to, unlawful conduct.  18 U.S.C. §§ 981(a); 983(c)(1).  In other words, it is not necessary for a court to decide whether a plaintiff *has already* alleged enough to support a reasonable belief that the property is tainted, only that there is a reasonable belief that *it could*--after completion of the discovery process--prove by a preponderance of the evidence that the property is tainted.  *See United States v. Real Property Known as 223 Spring Water Lane, Knoxville, Knox County, Tennesee*, No. 6:18-CV-315-REW, 2021 WL 144245, at *2 (E.D. Ky. Jan. 15, 2021).  To do this, courts look to the "totality of the evidence" as described in the complaint.  *See Funds in the Amount of Thirty Thousand Sixty Hundred Seventy Dollars*, 403 F.3d 448, 455 (7th Cir. 2005).

Accordingly, complaints need only describe the general contours of a scheme and not its minute details.  *See United States v. Two Condominiums Located at 465 Ocean Drive, United 315 and 316, Miami Beach, Fla. 33139*, No. 21-cv-04060-CRB, 2021 WL 3810273, at *3 (N.D.Ca. Aug 26, 2021). The general contours of the scheme alleged by this Complaint are not hard to understand:  A.Y. worked on behalf of the Company.  He formed MCS and opened two bank accounts to operate as a slush fund: one to receive money from the Company (promotional money laundering), one to pay out money and gifts to influential persons and officials who could and did perform official acts favorable to the Company.  Money received into the first account was then transferred to the second account to hide that the money came from the Company (transacting in criminal proceeds and laundering of monetary instruments).  A.Y. structured the income streams

into the accounts in such a way so as to avoid detection by regulatory authorities, because those authorities would have questioned how A.Y. and MCS were spending the money. Even under a "slightly higher" pleading standard, these facts that are "sufficiently detailed" such that a person could form a "reasonable belief that the government will be able to meet its burden of proof at trial." *See United States v. $97,667.00 in U.S. Currency*, 538 F. Supp. 2d 1246, 1251 (C.D. Cal. 2007) (discussing Supplemental Rule G(2)).

In their motion, Claimants supply a list of federal cases describing the requirements to prove a deprivation of honest services wire fraud case, none of which address the sufficiency of a civil complaint alleging deprivation of honest services wire fraud. ECF No. 16 at 14-15. At this stage of the proceedings, the question is not whether the Government has met its burden of proof, but rather whether there is a reasonable belief that *it will be able to after discovery*. From those cases, Claimants also mistakenly conclude that at trial the Government must be able to show a "clear and unambiguous" or "explicit" promise to prove an honest services wire fraud. ECF No. 16 at 17-18. That is not so. Although there must be evidence to support an unambiguous *quid pro quo*, the agreement or "promise" of that *quid pro quo* need not be explicit and may be inferred from circumstantial evidence. *See McDonnell v. United States*, 579 U.S. 550, 572 (2016) ("the agreement need not be explicit, and the public official need not specify the means that he will use to perform his end of the bargain."); *United States v. Kincaid*-Chauncey, 556 F.3d 923, 943 (9th Cir. 2009) (a *quid pro quo* may be inferred from evidence that shows "a course of conduct of favors and gifts flowing to a public office in exchange for a pattern of official acts favorable to the donor."); *United States v. Reichberg*, 5 F.4th 233, 246-48 (2d Cir. 2021) (upholding jury instruction that government did "not have to prove that there was an express or explicit agreement that the public official would perform…any particular official action," it is sufficient if the defendant understood that as a result of the payment, they would act favorably "as needed" or "as

specific opportunities arose."); *United States v. Arthur*, 544 F.2d 730, 734 (4th Cir. 1976) (upholding charge alleging "'course of conduct of favors and gifts flowing' to a public official in exchange for a pattern of official actions favorable to the donor even though no particular gift or favor is directly connected to any particular official act.")

The Complaint here describes numerous *quids* (*i.e.* a flow of gifts, favors, and campaign contributions to public officials, including to Individuals 3 and 4, and persons close to Individuals 3 and 4) and a pattern of *quos* (official acts favorable to the Company) by Individuals 3 and 4, such as:

- Participating in an effort to help the Company avoid contractual liquidated damages after it missed construction deadlines;
- Participating in an effort to extend the deadlines that the Company had previously contracted to meet;
- Helping to amend regulations to accommodate the Company's development schedule; and
- Countering efforts by others in the CNMI government to require that the Company provide proof of its financial capabilities or post a completion bond.

Assuming as it must, that these alleged facts are true, in other words, that Individuals 3 and 4 did these things, the Court should have reason to believe that the Government will, after discovery, be able to meet its burden of proving honest services wire fraud. This is far more information than has been provided in other forfeiture complaints that were found sufficient by various courts. For example, a court in the Northern District of Illinois upheld a forfeiture complaint that vaguely described "iPads, iPhones, and other mobile devices" that were allegedly stolen between 2012 and September 2013, and wires [received] into subject account between June 6, 2013 and August 30, 2013 totaling $8,065,555.26. *United States v. Funds in the Amount of $246,197.44 Seized from JP Morgan Chase Bank Account XXXXX9895*, No. 14 CV 01570, 2015 WL 1943346, at *1 (N.D. Ill., Apr 29, 2015). Although the government could have provided more

11

details, there was enough for the claimants to prepare a rebuttal that was more than a general denial. *Id.*, at *4. *Cf. Two Condominiums Located at 465 Ocean Drive, United 315 and 316, Miami Beach, Florida 33139*, 2021 WL 3810273 (finding that the complaint insufficiently alleged a connection between illegal activities and the subject properties but permitting the government to file an amended complaint).

Claimants also assert that Individuals 1-4 were not adequately identified. In order to protect the rights, privacy, and reputations of persons who are not currently facing federal criminal charges, the Government chose to use descriptions sufficient to inform the Claimants of their identities, but insufficient to inform anyone who was not part of the scheme. Specifically, the Complaint provides the following information for Individuals 1-4:

- **Individual 1** (a) is a resident of the CNMI; (b) is a partner in a business in the CNMI; (c) has bank accounts that show frequent cash deposits typically in increments of $1,000, some of which coincide with check encashments or cash withdrawals made by A.Y.; (d) met with A.Y. frequently; and (e) is closely associated with and frequently gave substantial amounts of money to Individual 3.

- **Individual 2** (a) is a resident of the CNMI; (b) is a partner in a business in the CNMI; (c) has bank accounts that show frequent cash deposits typically in increments of $1,000, some of which coincide with check encashments or cash withdrawals made by A.Y.; (d) met with A.Y. frequently; and (e) is closely associated with and frequently gave substantial amounts of money to Individual 3.

- **Individual 3** (a) is a political figure who owes a fiduciary duty the citizens of the CNMI (reasonable to infer a CNMI government official); (b) played an integral role in passage of the casino enabling legislation; (c) received campaign contributions from A.Y. and MCS; (d) was involved in giving the Company favorable treatment including allowing it to escape liquidated damages for missing construction deadlines, extending deadlines with little or no penalty, amending regulations to accommodate the Company's schedule, and deferring enforcement of tax, labor, and other contractual obligations; (e) is closely affiliated with Individuals 1 and 2 and frequently received substantial amounts of money from them; and (f) undermined efforts to require that the Company prove its financial capabilities or at least post a completion bond.

- **Individual 4** (a) is a political figure who owes a fiduciary duty the citizens of the CNMI (reasonable to infer a CNMI government official); (b) received campaign contributions from A.Y. and MCS; (c) had A.Y. arrange and/or pay for at least one

overseas trip; (d) is close to a person to whom MCS paid $62,500 in exchange for less than 8 pages of "memos" that were largely copied from the internet; (e) was involved in giving the Company favorable treatment including allowing it to escape liquidated damages for missing construction deadlines, extending deadlines with little or no penalty, amending regulations to accommodate the Company's schedule, and deferring enforcement of tax, labor, and other contractual obligations; and (f) undermined efforts to require that the Company prove its financial capabilities or at least post a completion bond.

These descriptions of Individuals 1-4 are not so vague that Claimants might be confused as to who they are. As alleged in the Complaint, A.Y. knows and has worked with all of them. Accordingly, the information described in the Second Scheme is more than enough for Claimants to commence an investigation of the facts and to frame a responsive pleading.

### C. The Third Scheme Involved Domestic Wire Communications.

Claimants mistakenly assume that the Government's wire fraud allegations described in the Third Scheme refer to the wires by which the Foreign Parent Company transferred funds from its foreign account to A.Y.'s foreign account. Those are not the communications "by wire in interstate and foreign commerce" to which paragraph 69 of the Complaint refers. Read in the context of the overall scheme, it is reasonable to infer that there were other domestic wire communications that prompted the overseas bank transfers. *See United States v. Hossain*, 972 F.3d 1138, 1143 (9th Cir. 2020) (wire occurred domestically and furthered a fraud overseas). As shown in the above-described case from the Northern District of Illinois, courts evaluating civil forfeiture complaints do not typically demand that a specific wire be identified, as one might otherwise expect in a criminal indictment.

### D. The Common Law "Revenue Rule" Does Not Apply.

The common-law revenue rule does not apply in this case. The common-law revenue rule, in summation, "prevents a foreign jurisdiction from either instituting a suit to recover taxes, or bring a suit to enforce its own court's judgment for taxes." *Her Majesty the Queen In Right Of the*

13

*Province of British Columbia v. Gilbertson*, 597 F.2d 1161, 1163 n. 1 (9th Cir. 1979). In *Pasquantino v. United States*, the Supreme Court distinguished a criminal wire fraud case brought by the United States from cases traditionally barred by the common-law revenue rule, such as a suit to enforce a tax judgment. 544 U.S. 349 (2005). The case did, however, involve the recovery of taxes as a form of restitution to the victim, the Canadian Government, and the Supreme Court opined, "[t]he purpose of awarding restitution in this action is not to collect a foreign tax, but to mete our appropriate criminal punishment for that conduct." *Id*. at 365. Even though another jurisdiction's revenue law was enforced indirectly, the enforcement was not in a manner that would violate the common law revenue rule. *Id*. at 367. Importantly, the *Pasquantino* Court noted "this prosecution poses little risk of causing the principal against which the revenue rule was traditionally thought to guard: judicial evaluation of the policy-laden enactments of other sovereigns." *Id*. at 368.

Here, similar to *Pasquantino*, the purpose of the forfeiture action is not to collect a foreign tax. This forfeiture action is based on allegations of criminal wire fraud and associated money laundering crimes. The purpose of the action is to forfeit proceedings from this activity, not to enforce a CNMI tax judgment. A.Y. defrauded the CNMI government of money by claiming business expenses on his CNMI taxes while being reimbursed for those same expenses from the Foreign Parent Company and used interstate wire communications to do so. Although, the Foreign Parent Company reimbursed his expenses to his foreign bank account, A.Y. still wrote-off the business expenses on his CNMI taxes, thereby depriving the CNMI government of additional money. The money subject to forfeiture is due to A.Y.'s wire fraud and not a collection effort on behalf of the CNMI government. Additionally, like *Pasquantino*, this action is not asking for judicial evaluation of another jurisdictions' tax law. Evaluation of the CNMI tax's law is not necessary to find a connection between the funds sought through forfeiture and the wire fraud

14

perpetrated against the CNMI government by A.Y. through his tax write-offs.

      **E. The Complaint Alleges Predicate Offenses that Support both Proceeds and Promotional Money Laundering.**

As established in the Complaint and above, A.Y. and MCS engaged in three schemes to commit wire fraud: first, to defraud the CCC of an initial application fee and biennial renewal fees; second, to deprive the people of the CNMI of their right to honest services; and third, to defraud the CNMI government of tax revenue. Defendant Funds were both instruments and proceeds of those schemes, because: (a) they were derived unlawfully, in violation of the CNMI law that prohibited receiving over a certain threshold of money from the Company without first obtaining a license from the CCC; (b) they were used in a years-long fraud to pay and provide gifts to certain individuals for the purpose of improperly influencing CNMI officials to act favorably toward the Company; and (c) they were structured and moved in ways designed to avoid detection by regulatory and tax authorities. Tracing and whether all of the claimed funds or only a part of the funds are subject to forfeiture are issues for trial, not a motion to dismiss. *Aguilar*, 782 F.3d at 1109-10 (citations omitted). Accordingly, the financial analysis establishes that Defendant Funds were proceeds of, involved in, and/or used to further schemes involving interstate state wire communications, all in violation of 18 U.S.C. §§ 1343, 1346, 1349, 1956(a), 1956(a)(2)(A), and 1957(a) and subject to forfeiture.

//

//

//

//

//

//

## V. CONCLUSION

For the reasons set forth in this Opposition, the United States respectfully requests the Court deny Claimants' Motion to Dismiss, or in the alternative, grant leave for the Government to amend the Complaint.

RESPECTFULLY SUBMITTED this 5th day of May, 2023.

        SHAWN N. ANDERSON
        United States Attorney
        Districts of Guam and the NMI

By:   */s/ Jessica F. Wessling*
        JESSICA F. WESSLING
        ERIC S. O'MALLEY
        Assistant U.S. Attorneys