MARK B. HANSON, ESQ.
Second Floor, Macaranas Building
Beach Road, Garapan
PMB 738 P.O. Box 10,000
Saipan, N. Mariana Islands 96950
Telephone:   (670) 233-8600
Facsimile:    (670) 233-5262
E-mail:        markbhanson@gmail.com

Attorney for *Claimants Marianas Consultancy Services, LLC and Alfred Yue*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN MARIANA ISLANDS**

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> $271,087.88 IN U.S. CURRENCY SEIZED FROM BANK OF SAIPAN ACCOUNT NO. ENDING IN LAST FOUR DIGITS 0157, HELD IN THE NAME OF "MCS" <br><br> and <br><br> $39,188.38 IN U.S. CURRENCY SEIZED FROM BANK OF SAIPAN ACCOUNT NO. ENDING IN LAST FOUR DIGITS 2098, HELD IN THE NAME OF "MCS," <br><br> Defendants. | CASE NO.   1:22-cv-00020 <br><br> REPLY RE: <br> MOTION TO DISMISS <br> VERIFIED COMPLAINT FOR <br> FORFEITURE *IN REM* <br><br><br> Date:  Thursday, June 8, 2023 <br> Time:  11:00 a.m. <br> Judge:  Ramona V. Manglona, Chief Judge |

CLAIMANTS Marianas Consultancy Services, LLC ("MCS") and Alfred Yue ("Yue"), by and through their undersigned counsel, hereby reply to the Government's Opposition to Motion to Dismiss (ECF No. 17). In its Opposition, the Government doubles down on its "conspiracy theories" embellishing them with more colorful rhetoric, but does not actually address the patent factual and legal defects of their Complaint that leave it well short of making out even the weakest case for civil forfeiture of any amount. This is not a case of the sufficiency of an indictment nor even whether an affidavit of probable cause adequately states legally cognizable grounds for a search and seizure. The Government is seeking to forfeit citizens' money under particular statues that have particular

definitions and particular requirements with particular interpretations many of those interpretations by the United States Supreme Court itself. Despite, their suggesting to the contrary, "close enough" is insufficient here where the Court can determine from even the best reading of the allegations with *unreasonable* inferences cannot cure the defects in the forfeiture grounds the Government asserts.

1. <u>The Plausibility Pleading Standard</u>: In its Opposition, the Government repeatedly mis-cites *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) for the "no set of facts" notice pleading standard of *Conley v. Gibson*, 355 U.S. 41 (1957) that the Supreme Court itself eschewed in *Twombly* and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). As the Court is well aware, that is not the pleading standard that applies now and here. Not only does the facial plausibility pleading standard of *Twombly/Iqbal* apply, but the Government's pleading obligation is heightened under Supplemental Rule G which requires an additional level of particularity. *See United States v. Aguilar*, 782 F.3d 1101, 1109 (9th Cir. 2015).

Claimants concede that the Government does not have to *establish*, factually, in its Complaint its grounds for forfeiture of the Defendant Funds, i.e., "prove up" its case, but the Government does have to demonstrate with factual specificity a reasonable basis to believe that it will be able to prove by a preponderance of the evidence at a trial grounds for forfeiture on the facts and theories pled in the Complaint. In that exercise, the Government has failed and its Complaint should be dismissed.

2. <u>CCC Licensing Fees (i.e., the new essence of Scheme 1)</u>: Seemingly conceding that a scheme to avoid being regulated by the CCC does not itself constitute a "property interest," the Government has dramatically shifted its argument to the suggestion that Claimants and the Casino Licensee had as a "core objective" of their scheme (pled in the complaint as an "effect"), the avoidance of the CCC's biennial (and nominal), vendor license fee. Opposition at 6. There is, however, no plausibility to the Government's unexpressed inference[1] that vendor license fee

---

[1] As noted, there are no allegations in the Complaint that unpaid licensing fees were anything other than a nominally beneficial consequence of avoiding licensing by the CCC.

Page 2 of 10

avoidance was even contemplated by Claimants, much less that it was a "core objective" of the scheme to defraud.

First, despite the seemingly conflicting allegations of the Complaint that Complaints' owe CCC licensing fees from 2014 (compare ¶ 35 (original threshold in October 2016) with ¶ 47 (MCS owed a 2014 "application fee" presumably intended to allege a *licensing* fee) and the fact that the CCC did not even exist prior to late-October 2014, at the earliest, when its first three Commissioners were confirmed, CCC licensing, in general, was not implemented until April 2015 with the introduction of the first CCC regulations and the "casino service provider" license, a defined term by those emergency regulation adopted as permanent in September 2015. More specifically applicable to the allegations here, "vendor" licensing (also separately defined) was not implemented by the CCC until November 28, 2015 with the CCC's addition of the separate "casino vendor license," again by emergency regulations later adopted as permanent.[2] [3]

---

[2] Vendor licenses were later clarified and divided into "gaming" and "non-gaming" by regulation effective January 2021 and differentiated between "licenses" and "registration," respectively. *See* 42 Com. Reg. 44562-44657 (changing the previously defined "casino vendor licensee" to "casino gaming vendor licensee" and "non-gaming vendor registrant."). *See also* Commission response to comments at 44568: "The proposed change merely changes the present regulation's 'service providers' and 'vendors' to 'gaming vendors' and 'non-gaming vendors.'").

[3] Notably, there are no allegations in the Complaint that Claimants were "casino service providers" as defined in every iteration of the CCC regulations from 2015 to-date, yet the Complaint alleges the nonpayment of "casino service provider" licensing fees (definitionally related to "gaming") instead of the lesser licensing fees to which non-gaming "vendors" over a certain threshold were subject. Indeed, the Complaint itself alleges that Claimants were required to obtain a "CCC vendor license." Complaint, ¶ 46. Moreover, the allegations of ¶ 47 are demonstrably false even with regard to a "casino service provider" licensing fee first implemented in FY2015 for (2015 to 9/302016 and 10/1/2017 to 9/30/2018) though the total still amounts to $10,000 for gaming related service providers.

In reality, the fees for a "casino vendor license" *were only $2,000 every two fiscal years* and only began on November 28, 2015 (already FY2016) with the CCC's publication of emergency regulations. *See* 37 Com. Reg. 37125-37236. and NMIAC § 175-10.1-1225(b) (current). Prior to that time, casino vendors were not licensed at all. Accordingly, at best, the licensing fees that Claimants' allegedly avoided would have amounted to $2,000 through FY2017 (9/30/2017) plus $2,000 through FY2019 (9/30/2019). Essentially, $1,000 per fiscal year. Again, well-pled or not, it is not plausible that Claimants and the Casino Licensee devised an elaborate, years long scheme to wire money from China to Saipan to avoid the payment to the CCC of a sum total of $4,000 in licensing fees from early 2014 to the end of 2019.

Accordingly, as alleged, the Government's theory must necessarily be that either: (1) Claimants and the Casino Licensee concocted a scheme to defraud the CCC out of *possible* future nominal license fees, or (2) the object of their alleged 2014 straight-up scheme to avoid licensure *changed* in late-2015 to include as a "core objective" avoiding what was in reality the <u>$1,000 annual cost</u> of a CCC non-gaming vendor license.[4]

Claimants reiterate: regardless of whether either scenario has actually been well-pled in the Complaint, neither of those two scenarios are remotely plausible. Notwithstanding the other factual deficiencies of the Government's allegations, paragraph 30 of the Complaint alleges that "the Company transferred more than two million dollars" to Claimants between 2014 and 2019. In that time, as alleged, Claimants' unpaid CCC licensing fees would not have started to accrue until 2016 and, as alleged, would have amounted to a total of $10,000. *See* Complaint ¶ 36.

Given the level of funding, the amount of reimbursement and the *real* "core" benefit the Complaint alleges, there are no plausible allegations that Claimants and the Casino Licensee devised a scheme to defraud the CCC, even in part, in order to avoid the payment of a grand total of $10,000 in licensing fees (as pled). The implausibility of that bare, jurisdictional assertion is highlighted by the Government's allegations that the *"other object"* of the *same scheme* was for Claimants to avoid being closely regulated by the CCC so that they could spread money around to influence public figures.

"[Money or property] must play more than some bit part in a scheme: It must be an 'object of the fraud.'" *Kelly v. United States*, 140 S.Ct. 1565, 1573 (2020) (quoting *Pasquantino v. United States*, 544 U.S. 349, 355 (2005)). "[A] property fraud conviction cannot stand when the loss to the victim is only an incidental byproduct of the scheme." *Id. See also Cleveland v. United States*, 531 U.S. at 21. (rejecting the Government's contention that licensing fees and licensing revenue were property interests out of which Louisiana had been defrauded).

---

[4] Claimants maintain, however, that they never fell into any category of CCC regulated "service provider" of whichever flavor.

While the Government's attempt to carve out the Third Circuit panel's decision in *United States v. Hird* as a better analog to the facts of this case, Claimants would note that the *Hird* decision clearly distinguished the state's regulatory power to impose licensing fees (not property) from the "judicial power" to levy fines and costs for violating its state's traffic laws (property). 913 F.3d 332, 341 (3rd Cir. 2019) ("These fines and costs . . . cannot be cabined as a product of the states' regulatory authority. They are part and parcel of the judgment of the court."). *See also* id. at 342 ("Unlike *Cleveland*, the fines and costs play a central role in the scheme as alleged.").

The Government also chose to disregard/ignore the more recent SCOTUS decision in *Kelly v. United States* that resolved any unapparent ambiguity between the object and a by-product of a scheme to defraud regardless of whether it was an economic loss to the state regulator. 140 S. Ct. 1565, 1569 ("the employees' labor was just the incidental costs of that regulation, rather than itself an object of the officials' scheme.").

Licenses are "purely regulatory." *Cleveland v. United States*, 531 U.S. at 21. On the best reading of the facts, that was the only plausible "object of the fraud" the government alleges here. Appending nominal licensing fee allegations to create a "property interest" for a wire fraud allegation is jurisdictional subterfuge.

3. <u>"Unlicensed" Earnings</u>: There is also no efficacy to the Government's new, unpled assertion in its Opposition that "every dollar over the threshold amount" of the CCC licensing was "illegal" and, therefor, laundered "proceeds" of the unpled Specified Unlawful Activity ("SUA") of "illegality."[5] Obviously, the object of any plausible conspiracy could not have been to "make dollars" in excess of a licensing threshold without more. Moreover, the "excess dollars" is not money or property to which the CCC was entitled in any case.

---

[5] See, for example, the Government's argument at page 15: "Defendant Funds were both instruments and proceeds ... because (a) they were derived unlawfully, in violation of the CNMI law that prohibited [irrelevant]." Notably, there is no CNMI law that is an SUA specified in 18 U.S.C. § 981(a)(1)(C) nor the extensive expanded listing of SUA's in 18 U.S.C. § 1956(c)(7).

4. <u>Proceeds of an SUA</u>: It also appears that Claimants' assumption was correct, i.e., that the Government intends to argue that the *international* wire transfers to Saipan in furtherance of Scheme 1 were the "proceeds" of "international promotional money laundering" pursuant to 18 U.S.C. § 981(a)(1)(A) via 18 U.S.C. § 1956(a)(2)(A) that the Government then argues were tainted funds used to promote other SUAs without a corresponding "international" wire transfer, e.g., the Scheme 3 CNMI tax fraud. The broad "involved in a transaction" coverage of subsection 18 U.S.C. § 981(a)(1)(A) is limited to violations of the money laundering subsections themselves which, with few exceptions, requires the use of *already tainted funds*, i.e., proceeds of some prior SUA.

Domestically wire funds, for example, even where they are the instrument of a wire fraud conspiracy, are not "proceeds" of that intended wire fraud nor are they subject to forfeiture under any other theory of relevance to this case. A violation of 18 U.S.C. § 1956(a)(1) requires the use of already tainted funds as does 18 U.S.C. § 1957. And that includes allegations based on "concealment," i.e., concealing untainted funds is not a wire fraud violation. *See* 18 U.S.C. § 1956(a)(1)(B)(I).

The Government's repeated red herring arguments alleging "structuring," "concealing" and "hiding" money has no bearing on the use of untainted funds in this case. Stated another way, even if Claimants' actually did attempt to "conceal" the origin of the funds they were using in Saipan, unless those funds were *first* wired internationally to Saipan in furtherance of *some other SUA*, there is no money laundering violation and the funds are not subject to forfeiture.[6]

The "international" nature of the wire transfers and § 1956(a)(2) is the key to all of the Government's theories regarding the use of tainted funds ("proceeds") to commit an SUA. Because the Government, on the facts and theories alleged, will not be able to make a case at trial for defrauding the CCC of its regulatory oversight nor of using internationally wired money to bribe public official in exchange for official acts, there are no other possible avenue to creation of "tainted

---

[6] Similarly, alleging the obfuscation of the origins or ownership of internationally wired funds is either duplicitous or irrelevant.

funds" that could have been used to promote any further SUAs. Accordingly, to the extent any of the Government's grounds for forfeiture are premised on the use of "*proceeds*" of an SUA, those claims must also be dismissed.

5. A "Clear and Unambiguous" Quid Pro Quo:

That Ninth Circuit "clear and unambiguous" standard from *United States v. Carpenter*, 961 F.2d 824, 827 (9th Cir. 1992) based on *McCormick v. United States*, 500 U.S. 257 (1991) was not at all undermined by the Supreme Court's subsequent decision in *United States v. McDonnell*, 136 S. Ct. 2355, 2371 (2016). *See United States v. Kincaid-Chauncey*, 556 F.3d 923, 944 n.15 (9th Cir. 2009) ("Only individuals who can be shown to have had the specific intent to trade official actions for items of value are subject to criminal punishment on this theory of honest services fraud." (emphasis added)

Quite the opposite, the *McDonnell* decision actually restricted, further, the government's propensity to broadly allege bribery schemes "as opportunities arise" with conclusory allegations like those of the Government's Complaint here. *See, e.g., United States v. Reichberg*, 5 F.4th 233, 247 (2nd Cir. 2021) ("*McDonnell* held that the official act expected to be taken by a bribed public official must be 'a decision or action on a question, matter, cause, suit, proceeding or controversy' that 'involve[s] a formal exercise of governmental power' and must concern 'something specific and focused that is pending or may by law be brought before a public official.'"); *United States v. Skelos*, 988 F.3d 645, 656 (2nd 2021) ("as opportunities arise" theory of bribery requires contemporaneous agreement to take official action on a "specific and focused question or matter" (citations omitted)).

Here, the Government at the very least must plead facially plausible facts from which Claimants can divine what specific official agreed to perform "specific and focused" official acts in exchange for beneficial payments and, importantly, *when* that agreement was consummated. Instead, the Government's Complaint broadly alludes to only two "doe" public figures (though the Complaint is not a criminal indictment), an unspecified number of other official and unofficial "influencers" and allegations that, collectively, "they were involved in giving favorable treatment"

over a range of years (including the time before Claimants were even involved with the eventual Casino Licensee) without any plausible allegation that any public official agreed to perform official acts in exchange for money, trips, golf or beer when that initial exchange of promises took place.

The Government has fallen woefully short of even a "low bar" pleading obligation relying solely on the conspiratorial insinuation (and false syllogism) that Claimants spread a lot of the Casino Licensee's money around Saipan and the CNMI government though various agencies made a few concessions that benefitted the Casino Licensee, therefor Claimants must have entered into an illegal *quid pro quo* arrangement with public officials.

As the Supreme Court did in *United States v. McDonnell*, 136 S. Ct. at 2375, this Court should temper the Government's "boundless interpretation of the federal bribery statute" and make the Government articulate non-conclusory facts from which Claimants can discern who it alleges promised what and when, *i.e.*, plausibly plead an illicit "*quo pro quo* agreement" with a "public official" promising benefits in exchange for "official acts" at the time the agreement was made.

6. "Tracing" Is Not the Fatal Defective.

While Claimants would generally agree that "tracing is not an issue at the motion to dismiss stage," the Government still must plead "sufficiently detailed facts to support a reasonable belief that the Government will be able to meet its burden of proof at trial." *United States v. Aguilar*, 782 F.3d 1101, 1109 (9th Cir. 2015). Here, the issue is not of "tracing" laundered funds to the Defendant Funds. The dispositive problem with the Government's Complaint is that, as pled, it is *not even possible* that the funds allegedly involved in the schemes could be traced to the Defendant Funds.

With regard to the alleged tax fraud, for example, the allegations of the Complaint are that: (1) Claimants parted with money that they later claimed as deductible business expenses in Claimant Yue's CNMI income tax filing, (2) despite the fact that the Casino Licensee had reimbursed Claimants for the same expenses, (3) thereby under reporting his income and the resulting tax liability thereon, and (4) the "reimbursement" funds were wired from or on behalf of the Casino Licensee from a foreign country to Claimants in another foreign country. All of that

inarguably means that there is no possibility that the "proceeds" of the tax fraud on the CNMI Government in an account in the foreign country are, in whole or in part, the Defendant Funds seized from bank accounts in the CNMI.

The Government's argument necessarily cannot be that the Court has to wait until trial to find that there is no possible way that *any* of the Defendant Funds are "proceeds" of an SUA and subject to forfeiture. Again, that is not a "tracing" issue it is a claim that cannot be made. There can be no reasonable belief that the Government will be able to prove at a trial that it is entitled to forfeiture of any of the Defendant Funds. There is no justification for allowing this case to proceed any further on the Government's lazy pleading and shoddy reasoning. This forfeiture case should be dismissed.

Respectfully submitted this 12th day of May, 2023.

/s/ Mark B. Hanson

MARK B. HANSON

Second Floor, Macaranas Building
Beach Road, Garapan
PMB 738 P.O. Box 10,000
Saipan, N. Mariana Islands 96950
Telephone: (670) 233-8600
Facsimile: (670) 233-5262
E-mail: markbhanson@gmail.com

Attorney for *Claimants Marianas Consultancy Services, LLC and Alfred Yue*

CERTIFICATE OF SERVICE

I certify that the following were served with a copy of the foregoing via the Court's Case Management/Electronic Filing System:

>Mikel Schwab, AUSA (mikel.schwab@usdoj.gov)
>Jessica F. Wessling, AUSA (Jessica.F.Cruz@usdoj.gov)
>Eric S. O'Malley, AUSA (Eric.O'Malley@usdoj.gov)
>UNITED STATES ATTORNEY'S OFFICE
>4 Sirena Plaza, Suite 500
>108 Hernan Cortez Avenue
>Hagåtña, Guam 96910

DATED: May 12, 2023        /s/ Mark B. Hanson

                                                                                        MARK B. HANSON