F I L E D
Clerk
District Court

MAR 12 2025

for the Northern Mariana Islands
By_____
(Deputy Clerk)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN MARIANA ISLANDS

UNITED STATES OF AMERICA,

                Plaintiff,

     v.

$271,087.88 IN U.S. CURRENCY SEIZED
FROM BANK OF SAIPAN ACCOUNT NO.
ENDING IN LAST FOUR DIGITS 0157,
HELD IN THE NAME OF "MCS"

     and

$39,188.38 IN U.S. CURRENCY SEIZED
FROM BANK OF SAIPAN ACCOUNT NO.
ENDING IN LAST FOUR DIGITS 2098,
HELD IN THE NAME OF "MCS,"

                Defendants.

Case No. 1:22-cv-00020

**DECISION AND ORDER
GRANTING IN PART
CLAIMANTS' MOTION
TO DISMISS VERIFIED COMPLAINT
FOR FORFEITURE *IN REM* PURSUANT
TO FRCP G(8)(b)(i) AND 12(b)(6)**

## I.    INTRODUCTION

Plaintiff United States of America ("United States") filed a verified complaint for forfeiture in rem in this civil action against the Defendants—amounts of funds seized pursuant to a warrant obtained during an investigation by the Federal Bureau of Investigation ("FBI") and U.S. Internal Revenue Service – Criminal Investigation ("IRS-CI") of a conspiracy to commit wire fraud and money laundering. (Compl. ¶¶ 2, 15, ECF No. 1.) The alleged conspirators are entities and individuals based abroad and in the Commonwealth of the Northern Mariana Islands ("CNMI"). (*Id.* ¶ 2.) The two Defendants are $271,087.88 in U.S. Currency Seized from a Bank of Saipan Account held in the name of "MCS" and $39,188.38 in U.S. Currency Seized from another Bank of Saipan Account held in the name of "MCS" (collectively, "Defendant Funds"). (*Id.* ¶ 1.) Claimants are Marianas Consultancy Services, LLC ("MCS") and Alfred Yue, who jointly filed a verified claim asserting an interest in the Defendant Funds and contesting the forfeiture of the Funds pursuant to

1

the Federal Rules of Civil Procedure's Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supplemental Rule") G(5)(a). (Verif. Claim, ECF No. 8.) After the Court granted several stipulated extensions (ECF Nos. 10, 13, 15), Claimants filed a motion to dismiss the United States' verified complaint pursuant to Supplemental Rule G(8)(b)(i) and Federal Rule of Civil Procedure ("FRCP") 12(b)(6) for failure to state a claim upon which relief can be granted. (Mot. 1, ECF No. 16.) The United States filed an opposition (Opp'n, ECF No. 17), to which Claimants filed a reply (Reply, ECF No. 18). The matter came before the Court for a hearing (Mins., ECF No. 19) and based on the record, a review of the applicable law, and consideration of counsel's oral arguments, the Court now GRANTS IN PART AND DENIES IN PART Claimants' motion to dismiss for the following reasons, with leave for the United States to amend its complaint.

## II.    FACTUAL ALLEGATIONS

In deciding the motion to dismiss under FRCP 12(b)(6), the Court views the verified complaint's factual allegations in the light most favorable to the plaintiff and accepts the following factual allegations as true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009); *Autotel v. Nevada Bell Telephone Co.*, 697 F.3d 846, 850 (9th Cir. 2012).

### A.  Relevant Individuals and Entities

The United States premises the complaint on "a suspected conspiracy by foreign entities and entities and individuals in the [CNMI] to commit wire fraud and money laundering." (Compl. ¶ 2.) As introduced above, the Defendant Funds are $271,087.88 in U.S. currency seized from Bank of Saipan Account No. ending in last four digits 0157 held in the name of MCS ("MCS Account 1"), and $39,188.38 in U.S. currency seized from Bank of Saipan Account No. ending in last four digits 2098 also held in the name of MCS ("MCS Account 2"). (*Id.* ¶ 1.) The parties involved in the alleged conspiracy include: A.Y., the sole owner and operator of MCS, and the sole signatory of MCS Accounts 1 and 2; "Foreign Parent Company," a Chinese investment holding company registered in

Bermuda and headquartered in Hong Kong that owns a company registered in the British Virgin Islands ("BVI"); and the BVI company, which owns "Domestic Subsidiary Company," a CNMI incorporated and registered company ("the Company" refers to the Domestic Subsidiary Company and its parent companies). (*Id.* ¶¶ 8–9.) The Foreign Parent Company utilized a company based in Hong Kong ("Foreign Payroll Company") between August 2017 and November 2019 for purported professional business services, including payroll services. (*Id.* ¶ 10.)

### B. Background of the Alleged Conspiracy

"Beginning in 2013, the owners and operators of the Company established relationships with CNMI political figures by, *inter alia*, sponsoring foreign trips, including to Hong Kong and Macau, and on at least one occasion, to Singapore via private jet." (*Id.* ¶ 20.) "Following the trips, the participating political figures joined other members of the CNMI legislature to pass a bill which enabled an exclusive gaming license on a certain island within the CNMI." (*Id.* ¶ 21.) "The CNMI Senate passed the bill on the first and final reading." (*Id.* ¶ 23.) "The bill was signed into law in March 2014." (*Id.*) "However, procedural violations that deprived the public of required notice and other defects resulted in two subsequent bills to correct the errors." (*Id.*) "The final bill was signed into law in July 2014." (*Id.*) Individual 3, about whom more detail is provided *infra* § II.D., "played an integral role in the passage of the casino enabling legislation." (*Id.*) About a month later, the appointed body of CNMI government officials awarded the exclusive license to the Company after the only other bidder was disqualified. (*Id.* ¶ 24.) "Months prior to receiving the license, in May 2014, the Company had already begun paying MCS and A.Y. several thousand dollars per month." (*Id.* ¶ 25.)

"On or about June 1, 2015, A.Y. signed a letter agreement with the Domestic Subsidiary Company for MCS to serve as a 'consultant' at a rate of $5,000 per month." (*Id.* ¶ 26.) "Under this agreement, MCS was to receive reimbursements for costs and expenses only if such payments were

previously approved by the Domestic Subsidiary Company." (*Id.*) "Days later, on or about June 18, 2015, A.Y. signed a second letter agreement with the Foreign Parent Company to be a 'consultant' at a rate to be 'further determined and agreed in writing . . . .'" (*Id.* ¶ 27.) "Under the second agreement, A.Y. was to be reimbursed by the Foreign Parent Company for 'all reasonable costs and expenses' upon production of receipts." (*Id.*) "Three years later, A.Y. and the Domestic Subsidiary Company signed an 'amended agreement' dated November 6, 2018, which established that A.Y. would be paid at a rate of $184,000 Hong Kong dollars (approximately $23,500 United States dollars) per month . . . ." (*Id.* ¶ 28.) Between about 2014 and about 2019, the Company transferred more than two million dollars to MCS and A.Y. primarily through: (1) monthly checks of $5,000 from the Domestic Subsidiary Account that were deposited to MCS Accounts; (2) monthly international wire transfers of approximately $34,000 or $35,000, at first directly from the Foreign Parent Account in Hong Kong to MCS Account, and then indirectly through the Foreign Payroll Account in Hong Kong to MCS Account 1; and (3) frequent reimbursements from the Foreign Parent Account in Hong Kong to an account held by A.Y. in China, which A.Y. failed to report as required by U.S. law. (*Id.* ¶ 30.) "The reimbursements from the Foreign Parent Account to A.Y.'s foreign account were for 'expenses' paid from MCS Accounts in the CNMI." (*Id.* ¶ 31.) In one instance of reimbursement in August 2016, "A.Y. invoiced the Company for $120,000 reimbursement that simply described 'special projects.'" (*Id.* ¶ 32.)

The United States alleges that the funds were transferred to promote three schemes, and that each scheme thus supports civil forfeiture of the Defendant Funds under 18 U.S.C. §§ 981(a)(1)(C) and 981(a)(1)(A). (*Id.* ¶¶ 2, 17, 19.)

## C. Scheme 1: Defrauding the CCC

In the first scheme, the United States asserts that A.Y. and MCS, together with the Company and others, knowingly defrauded the CNMI and the Commonwealth Casino Commission ("CCC")

by "materially understat[ing] the extent of the services that A.Y. and MCS provided to the Company." (*Id.* ¶ 33.) "The effects of the scheme to defraud were to frustrate CCC's ability to accomplish its mission of overseeing and regulating the Company's operations and to deprive the CCC of fees to which it was entitled." (*Id.*)

"The CCC is the body charged with regulating the holder of the exclusive casino license and is generally responsible for guarding against the infiltration of criminal influences in an industry prone to such influences." (*Id.* ¶ 34.) The Company was awarded the exclusive casino license in 2014. (*Id.* ¶¶ 23–24.) Pursuant to the CCC's regulations, "all vendors who provide 'services of any kind' to the Company or its affiliates in excess of a set threshold must be licensed by the CCC." (*Id.* ¶ 36.) In October 2016, the original threshold amount was $100,000 per year, but that was raised to $250,000 per year in January 2017. (*Id.*) To apply for a license, service providers must "complete a lengthy application form, . . . submit to an investigation, and . . . pay a non-refundable $5,000 application fee and a $5,000 biannual renewal fee." (*Id.*) The purpose of this license requirement "is to promote transparency, by subjecting those who engage in significant business activity with the Company to heightened diligence." (*Id.* ¶ 37.) Although the CCC is authorized to access accounting and bank records at the *Domestic Subsidiary Company* such that it can verify the accuracy of the Company's monthly "Master Vendor List" of every entity it transacts business, the CCC cannot access the *Foreign Parent Company's* accounting and bank records. (*Id.* ¶¶ 38–40.)

From about 2014 to about 2019, A.Y. and MCS provided various services to the Company and its affiliates, namely consulting and lobbying services, and "received $5,000 per month by check from the Domestic Subsidiary Accounts as well as at least $34,000 per month by international wire transfer from either the Foreign Parent Company . . . or the Foreign Payroll Company . . . to MCS Account [sic]." (*Id.* ¶¶ 41, 44.) Only the amounts that were paid to MCS by the Domestic Subsidiary Company, which were below the threshold amount requiring a CCC license, were listed on the

Company's Master Vendor List. (*Id.* ¶ 45.) While the amounts paid to MCS from the Foreign Parent Company (or the Foreign Payroll Company employed by the Foreign Parent Company) exceeded the threshold limit requiring MCS to obtain a CCC license, "[n]either MCS nor A.Y. obtained a CCC vendor license," which enabled A.Y. and MCS to "escap[e] the heightened CCC diligence" to which they were subject to by law and avoid paying required fees to the CCC. (*See id.* ¶¶ 44–46.) This first scheme "deprived the CCC of its ability to perform its missions, in addition to depriving it of the $5,000 application fee that MCS owed in 2014, as well as the $5,000 renewal fees in 2016 and 2018." (*Id.* ¶ 47.) The complaint asserts that the Company, A.Y., and MCS "conspired to have the Company make the $34,000 monthly payments by international wire transfer from either the Foreign Parent Company . . . or the Foreign Payroll Company . . . to MCS Account 1 to promote this scheme to defraud the CCC and the CNMI." (*Id.* ¶ 48.)

### D.  Scheme 2: CNMI Honest Services Fraud

The second scheme involved "illegally influenc[ing] government officials in exchange for preferential treatment, thereby depriving the citizens of the CNMI of their intangible right to honest services of those CNMI government officials, in violation of 18 U.S.C. §§ 1343 and 1346." (*Id.* ¶ 2.) A.Y., MCS, the Company and Individual 1, Individual 2, Individual 3, Individual 4, the Company, and others were involved. (*Id.* ¶ 49.) Individuals 1 and 2 are each residents of the CNMI and partners of a business in the CNMI. (*Id.* ¶¶ 11–12.) Individuals 3 and 4 are residents of and political figures in the CNMI who owe a fiduciary duty to the citizens of the CNMI. (*Id.* ¶¶ 13–14.) Individual 3 is closely affiliated with Individuals 1 and 2, and Individuals 1 and 2 frequently gave substantial amounts of money to Individual 3. (*Id.* ¶ 57.) From about June 2014 to about January 2019, "A.Y. and MCS used funds provided by the Company and channeled through MCS Accounts to contribute more than $46,000 to various individual candidates, campaigns, inauguration committees, and political parties--including Individual 3 and Individual 4." (*Id.* ¶ 50.) Additionally,

A.Y. paid nearly $200,000 for meals, entertainment, and several overseas trips for CNMI government officials——including Individual 4 at least once. (*See id.* ¶¶ 52, 55.) CNMI tax filings reveal that A.Y. treated "a substantial portion of the money that he received from the Company as 'business expenses,' namely the payments for travel, golf, meals, drinking and karaoke with government officials." (*Id.* ¶ 55.) Bank account records show frequent cash withdrawals from MCS Accounts and encashments of checks made payable to A.Y. in increments of $1,000, and Individuals 1 and 2 deposited $1,000 in cash to their or their business' bank accounts around the same time as their meetings with A.Y. (*Id.* ¶ 56.) Individuals 1 and 2 frequently gave substantial amounts of money to Individual 3. (*Id.* ¶ 57.) Between 2016 and 2018, MCS spent more than $320,000 on "legal and professional fees," nearly half of which were "payments from MCS Account 2 to persons in the CNMI who could influence policy involving the Company, including one person close to Individual 4." (*Id.* ¶ 58.) Between about 2014 and about 2019, A.Y. transferred more than 85% of the funds in MCS Account 1, approximately $1.579 million, into MCS Account 2. (*Id.* ¶ 67.) 89% of MCS Account 1's deposits for that time period came from accounts in China, including accounts in Hong Kong belonging to the Foreign Parent Company and the Foreign Payroll Company. (*Id.* ¶¶ 66–67.) A.Y. transferred the funds from MCS Account 1 to MCS Account 2, "effectively masking that the funds originated from foreign entities and from the Company." (*Id.* ¶ 67.)

"In exchange for the benefits . . . that A.Y. [provided], the CNMI government (with involvement from Individual 3, Individual 4, and other officials who benefitted from MCS's largesse) extended the Company uniquely favorable treatment," which included "allowing the Company to escape liquidated damages after missing construction deadlines[;] extending the Company's operation and related deadlines with little or no penalty[;] amending regulations to accommodate the Company's development schedule[;] . . . deferring enforcement of tax, labor, and other contractual obligations owed by the Company to the CNMI[;]" and "undermin[ing] various

efforts to mandate that the Company either provide verifiable proof that it was financially capable of completing its construction project, or to at least post a 'completion bond.'" (*Id.* ¶¶ 61–62.) As of the date of the complaint, "the project is far from complete," the Company does not appear to "have enough money to finish it, and there is no completion bond in place to mitigate the damage." (*Id.* ¶ 63.)

### E.  Scheme 3: Defrauding CNMI of Tax Revenue

The third scheme was one to defraud the CNMI government of money by evading the payment of the proper amount of income taxes. (*Id.* ¶¶ 2, 69.) MCS's CNMI tax filings for the years 2016 through 2018 claim MCS spent more than $320,000 on "legal and professional services" and other records show MCS paid $140,700 to "consultants." (*Id.* ¶¶ 70–71.) A.Y. treated these amounts as "overhead/business expenses incurred by MCS that reduced its revenue and therefore its associated tax liability." (*Id.* ¶ 72.) However, the Foreign Parent Company reimbursed A.Y.'s foreign bank account for these and other payments, which A.Y. did not report on MCS's tax returns. (*Id.* ¶¶ 72–74.) The reimbursements were difficult for the CNMI government to discover because the Company sent the money directly from one foreign bank account to another foreign bank account. (*Id.* ¶ 72.) In furtherance of this scheme to defraud, A.Y. concealed his assets from the United States when he knowingly and willfully failed to file a Report of Foreign Bank and Financial Accounts with the U.S. Department of Treasury for calendar years 2014 to 2017, with respect to the accounts involved in this foreign stream of income. (*Id.* ¶ 75.)

### III.    LEGAL STANDARD

"The Civil Asset Forfeiture Reform Act of 2000 ('CAFRA'), 18 U.S.C. § 983, governs all *in rem* civil forfeiture proceedings commenced on or after August 23, 2000." *United States v. Real*

*Prop. Located at 17 Coon Creek Rd.*, 787 F.3d 968, 972 (9th Cir. 2015) (citation omitted). Section

983(a)(4)(A) dictates:

> In any case in which the Government files in the appropriate United States district
> court a complaint for forfeiture of property, any person claiming an interest in the
> seized property may file a claim asserting such person's interest in the property in the
> manner set forth in the Supplemental Rules for Certain Admiralty and Maritime
> Claims . . . .

Supplemental Rule G(2)(f) provides that a forfeiture complaint must "state sufficiently detailed facts

to support a reasonable belief that the government will be able to meet its burden of proof at trial."

The government has the burden of proof "to establish, by a preponderance of the evidence, that the

property is subject to forfeiture[.]" 18 U.S.C. § 983(c)(1). The forfeiture complaint must "state the

circumstances from which the claim arises with such particularity that the defendant or claimant will

be able, without moving for a more definite statement, to commence an investigation of the facts

and to frame a responsive pleading." *See United States v. Aguilar*, 782 F.3d 1101, 1108 (9th Cir.

2015) (citation omitted).[1]

In addition to this specific pleading standard, forfeiture complaints are still subject to the

plausibility standard. *United States v. Real Prop. Located at 2323 Main St.*, No. SA CV 17-01592

DMG (SPx), 2023 WL 2817354, at *3 (C.D. Cal. Mar. 22, 2023); *United States v. Two Condos.

Located at 465 Ocean Drive*, No. 21-cv-04060-CRB, 2021 WL 3810273, at *3 (N.D. Cal. Aug. 26,

2021). To survive a motion to dismiss under FRCP 12(b)(6), a pleading "must contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556

U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The factual allegations

need not be detailed, but a plaintiff must provide "more than an unadorned, the-defendant-

---

[1] Supplemental Rule G(2)(f) was "designed to codify the 'standard' that 'has evolved' from case law interpreting its predecessor—Supplemental Rule E(2)(A)—and 'carr[y] this forfeiture case law forward without change.'" *Aguilar*, 782 F.3d at 1108.

unlawfully-harmed-me accusation." *Id.* In determining whether a motion to dismiss should be granted, there is a two-step process: first, "identify[] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *See id.* at 679. Conversely, "[a] motion to dismiss under [FRCP] 12(b)(6) will be granted only if 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Bonnichsen v. U.S. Dep't of the Army*, 969 F. Supp. 614, 619 (D. Or. 1997) (quoting *Gibson v. United States*, 781 F.2d 1334, 1337 (9th Cir. 1986)). Generally, when ruling on a FRCP 12(b)(6) motion, a court may consider only the pleadings and limited materials, such as "documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice . . . ." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). If a court considers other evidence, "it must normally convert the 12(b)(6) motion into a Rule 56 motion for summary judgment, and it must give the nonmoving party an opportunity to respond." *Id.* at 907 (citations omitted).

If a motion to dismiss is granted, "leave to amend should be granted unless it is clear that the deficiencies of the complaint cannot be cured by amendment." *Dog Bites Back, LLC v. JPMorgan Chase Bank, N.A.*, 563 F. Supp. 3d 1120, 1123 (D. Nev. 2021) (citing *DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992)). FRCP 15(a) dictates that leave should be given freely "when justice so requires" and "in the absence of a reason such as 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc.'" *Id.* (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

**IV.    DISCUSSION**

The United States cites to two separate bases for forfeiture of the Defendant Funds: 18 U.S.C. §§ 981(a)(1)(A) and 981(a)(1)(C). (Compl. ¶¶ 19, 17.) First, Section 981(a)(1)(A) provides that "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property" is subject to forfeiture. For this forfeiture basis, the Government alleges that the Defendant Funds are forfeitable because they were involved in money laundering transactions in violation of 18 U.S.C. §§ 1956, 1957 ("tainted funds forfeiture"), in addition to conspiracy to engage in money laundering in violation of 18 U.S.C. § 1956(h). (Compl. ¶ 19.) More specifically, the United States largely argues that the Defendant Funds are forfeitable pursuant to 18 U.S.C. §§ 981(a)(1)(A) and 1956(a)(2)(A) ("international promotional money laundering forfeiture") (*see id.* ¶¶ 3–4, 48, 66, 76). Section 1956(a)(2)(A) prohibits transmitting monetary instruments between a place in the United States and a place outside the United States with the intent to carry on specified unlawful activity, such as wire fraud prohibited by 18 U.S.C. § 1343 and honest services fraud prohibited by 18 U.S.C. § 1346. 18 U.S.C. §§ 1956(c)(7)(A), 1961(1).

Second, Section 981(a)(1)(C) specifies that "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense" is subject to forfeiture. Specified unlawful activity includes wire fraud prohibited by 18 U.S.C. § 1343 and honest services fraud prohibited by 18 U.S.C. § 1346. 18 U.S.C. §§ 1956(c)(7)(A), 1961(1). Using wire fraud and conspiracy to engage in wire fraud as the specified unlawful activities, the United States asserts that the Defendant Funds are subject to forfeiture under Section 981(a)(1)(C) "as property items that constitute or were derived from proceeds traceable to" wire fraud. (Compl. ¶ 17.)

The United States asserts that each of the three schemes constitutes specified unlawful activity, either wire fraud or honest services fraud, and thus supports forfeiture of the Defendant Funds under 18 U.S.C. §§ 981(a)(1)(A) and 981(a)(1)(C).[2] Claimants argue the United States fails to allege any specified unlawful activity and therefore fails to state a civil forfeiture cause of action. (*See* Mot. 10.) For the reasons explained below, the Court agrees that Schemes 1 and 3 fail to support forfeiture of the Defendant Funds under either forfeiture basis, but finds that Scheme 2 supports international promotional money laundering forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and 1956(a)(2)(A).

## A. Scheme 1 (Defrauding the CCC) Does not Support Forfeiture.

Because the complaint does not sufficiently allege that the object of Scheme 1 was to deprive the CCC of its money or property, Scheme 1 is not a violation of the federal wire fraud statute. Accordingly, Scheme 1 does not constitute specified unlawful activity and cannot support forfeiture under international promotional money laundering forfeiture or proceeds money laundering forfeiture.

"The federal wire fraud statute makes it a crime to effect (with use of the wires) 'any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises.'" *Kelly v. United States*, 140 S.Ct. 1565, 1571 (2020) (quoting 18 U.S.C. § 1343). Relying upon U.S. Supreme Court precedent on wire fraud cases, Claimants argue that because the alleged object of the fraud was to evade regulatory oversight, rather than deprive the CCC of money or property, the United States has failed to sufficiently allege federal wire fraud. (Mot. 12–13.) Claimants analogize to *Cleveland v. United States*, 531 U.S. 12 (2000), wherein the Supreme Court found that the state of Louisiana only had regulatory and no property interests in the

---

[2] As elaborated *infra* § IV.C., the United States conceded at the hearing that Scheme 3 does not support proceeds money laundering forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

issuance of video poker licenses. (*Id.* 11–12.) In response, the United States argues that the facts of *Cleveland* are distinguishable from this case; in *Cleveland*, "Louisiana had received all of the fees and other revenue to which it was fully entitled . . . ." (Opp'n 10.) The United States maintains instead that *Pasquantino v. United States*, 544 U.S. 349 (2005), wherein the Supreme Court determined that a government's right to collect taxes constitutes a property interest, is more analogous to the facts of this case. (*Id.*) The United States further argues that this case is "also more analogous to private fraud schemes where a defendant lies in an effort to avoid paying a higher rate" (*id.* at 11); the "operative question" is whether A.Y. and MCS owed money to the CCC (*id.* at 12 (citing *United States v. Hird*, 913 F.3d 332 (3d Cir. 2019)).). The United States' arguments rely on the fact that "the CCC had a right to the full payment of the $5,000 [application and bi-annual renewal] fees, but A.Y. evaded that payment by structuring his income streams in such a way (using the MCS accounts) that the CCC would only know about a fraction of those proceeds." (*Id.* at 11.) In reply, Claimants argue it is implausible that their avoidance of licensing-related fees in the amount of $10,000 was the "object of the fraud," as required by *Kelly*. (Reply 4.) Upon review of the parties' cited Supreme Court decisions, the Court finds that Claimants have the better argument.

Over two decades ago, in *Cleveland*, the Supreme Court considered whether a scheme which involved making false statements in an application for Louisiana state licenses to operate video poker machines violated the federal mail fraud statute.[3] 531 U.S. at 15. The Supreme Court concluded that licenses to operate video poker machines do not qualify as "property" because "the thing obtained must be property in the hands of the victim" and "[s]tate and municipal licenses in general, and Louisiana's video poker licenses in particular . . . do not rank as 'property,' . . . in the hands of the

---

[3] "Although *Cleveland* interpreted the term 'property' in the mail fraud statute, . . . [the Supreme Court] ha[s] construed identical language in the wire and mail fraud statutes *in pari materia*." *Pasquantino*, 544 U.S. at 355 n.2 (citations omitted).

official licensor." *Id.* Although "Louisiana ha[d] a substantial economic stake in the video poker industry," as it collected "a fixed percentage of net revenue from each video poker device" and application-related fees, the Court found that Louisiana's interests in the video poker licenses were regulatory and an exercise of state police power. *Id.* at 21–22. Louisiana was not deprived of those fees as it was paid its proper share of revenue. *Id.* at 22. "The State receives the lion's share of its expected revenue not while the licenses remain in its own hands, but only *after* they have been issued to licensees." *Id.* Prior to issuance, the licenses "do not generate an ongoing stream of revenue" for Louisiana. *Id.*

Shortly after *Cleveland*, the Supreme Court faced a similar issue—determining whether a plot to defraud Canada of tax revenue for alcohol brought from the United States violates the federal wire fraud statute. *Pasquantino*, 544 U.S. at 353. In *Pasquantino*, the "Canadian taxes then due on alcohol purchased in the United States and transported to Canada were approximately double the liquor's purchase price." *Id.* The Supreme Court determined that "Canada's right to uncollected excise taxes on the liquor petitioners imported into Canada is 'property' in its hands[;]" in other words, "[t]his right is an entitlement to collect money from petitioners, the possession of which is 'something of value' to the Government of Canada." *Id.* at 355 (citation omitted). "The object of petitioners' scheme was to deprive Canada of money legally due, and their scheme thereby had as its object the deprivation of Canada's 'property.'" *Id.* at 356.

Most recently, the Supreme Court decided *Kelly v. United States*, 140 S. Ct. 1565 (2020), clarifying that the object of the fraud must be money or property and finding that the commandeering of bridge access lanes was an exercise of regulatory power, failing to meet the money or property requirement. *Id.* at 1568–69. The public officials who ordered the commandeering did so as political retribution for a mayor's refusal to support a governor's reelection bid. *Id.* at 1568. Because "the deceit must . . . have had the '*object*' of obtaining the [government's] money or property[,]" the

Supreme Court rejected the argument that the object of the fraud was the use of government employees' paid labor which effectuated the commandeering, as the use of the "employees was incidental to—the mere cost of implementing" the commandeering. *Id.* at 1572 (emphasis added).

Here, the complaint by its own terms alleges that the object of the fraud was to evade the oversight of the CCC, which implicates the CNMI's regulatory interests rather than its property interests. Similar to Louisiana's interest in the video poker licenses in *Cleveland*, the CNMI's interest in CCC vendor licenses is regulatory, as the United States recognizes in its complaint. Specifically, the complaint states that "[t]he purpose of this regime [of requiring vendor licenses and related fees] is to promote transparency, by subjecting those who engage in significant business activity with the Company to heightened diligence." (Compl. ¶¶ 36–37.) By engaging in this scheme, neither MCS nor A.Y. obtained a CCC vendor license and they "were able to conduct significant business dealings with the Company while escaping the heightened CCC diligence to which they were, by law, subject, and while avoiding payment required fees to the CCC." (*Id.* ¶ 46.) Additionally, the United States describes the CCC as "the body charged with *regulating* the holder of the exclusive casino license." (*Id.* ¶ 34 (emphasis added).) The United States asserts that this scheme "deprived the CCC of its ability to perform its missions," in addition to depriving it of $15,000 in application fees and renewal fees. (*Id.* ¶ 47.) The United States attempts to distinguish *Cleveland* because the State of Louisiana was not deprived of those fees as it was paid its proper share of revenue, unlike the CCC which was never paid the requisite fees. (Opp'n 10 (citing *Cleveland*, 513 U.S. at 13).) However, the Government ignores the focus of *Cleveland*—that "the object of the fraud [must] be 'property' in the victim's hands and . . . a Louisiana video poker license in the State's hands in not 'property[.]'" 513 U.S. at 26–27. Similarly, the CCC vendor license is not property in the CCC's hands—CCC vendor licenses do not generate income prior to their issuance.

Further, the United States' reliance upon *Pasquantino* is misplaced as the instant facts are distinguishable. In *Pasquantino*, the object of the fraud "was to deprive Canada of money legally due, and [the] scheme thereby had as its object the deprivation of Canada's 'property.'" 544 U.S. at 356. The "Canadian taxes then due on alcohol purchased in the United States and transported to Canada were approximately *double* the liquor's purchase price." *Id.* at 353 (emphasis added). Here, it is implausible that the object of Scheme 1 was to defraud the CCC of the $15,000 in fees related to the CCC vendor license (*see* Compl. ¶ 47). The alleged scheme to defraud the CCC of $15,000 in fees over a period of several years (*id.* ¶ 36) pails in comparison to the over $2 million that the Company transferred to MCS and A.Y. between 2014 and 2019 as a part of the scheme (*id.* ¶ 30). The $15,000 in uncollected CCC vendor fees, which is not even one percent of $2 million, is a mere drop in the bucket compared to the taxes Canada was deprived of in *Pasquantino*—taxes that were double the price of the liquor. As the Supreme Court clarified in *Kelly*, "a property fraud conviction cannot stand when the loss to the victim is only an *incidental* byproduct of the scheme." 140 S. Ct. at 1573 (emphasis added). In *Kelly*, "the labor costs were an incidental (even if foreseen) byproduct of [the] regulatory object." *Id.* at 1574. Here, the avoidance of paying $15,000 in fees was similarly a foreseen, incidental byproduct, a means to achieving the ultimate objective—avoiding the CCC's oversight.

Moreover, even assuming arguendo that fee amount supports finding that the object of the fraud was avoiding payment of fees, the facts as alleged in the complaint indicate that the fees may have been due *after* the commencement of the scheme. There is a dispute as to when the first vendor license application fee would be due—was it October 2016 ("the original threshold amount, set by regulation in October 2016" (Compl. ¶ 36)); or in 2014 ("$5,000 application fee that MCS owed in 2014" (*id.* ¶ 47)); or even November 2015 as argued by Claimants (vendor licensing "was not

16

implemented by the CCC until <u>November 28, 2015</u>" (Reply 3)).[4] The complaint alleges that Scheme 1 began in 2014 (Compl. ¶ 33), so the object of Scheme 1 could not be to avoid payment of vendor fees if the vendor licensing regime was not implemented by the CCC until 2015, and the threshold amount not set until October 2016.

Therefore, the Court concludes that the complaint fails to state a claim of wire fraud under 18 U.S.C. § 1343 as to Scheme 1 because the CCC's interests in MCS's services to the Company are regulatory, and the object of Scheme 1 was to avoid the CCC's oversight. Relatedly, because the object of Scheme 1 was to avoid the CCC's oversight rather than to deprive it of money or property, the complaint also fails to state a claim of conspiracy to commit wire fraud under 18 U.S.C. §§ 1343 and 1349. Accordingly, Scheme 1 fails to allege the requisite specified unlawful activity for the United States' claims of international promotional money laundering under 18 U.S.C. § 1956(a)(2)(A) and conspiracy to commit international promotional laundering under 18 U.S.C. § 1956(h). Thus, Scheme 1 does not support either a claim for international promotional money laundering forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A), 1956(a)(2)(A) and 1956(h); or for proceeds money laundering forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 1956. The Court grants the motion to dismiss both forfeiture claims based on Scheme 1 because Scheme 1 fails to allege a deprivation of the CCC's money or property.

### B. Scheme 2 Supports Forfeiture Based on International Promotional Money Laundering and Honest Services Fraud.

"Honest services fraud entails a scheme or artifice to 'deprive another,' by mail or wire, 'of the intangible right of honest services.'" *United States v. Christensen*, 828 F.3d 763, 784 (9th Cir.

---

[4] At the hearing, the United States acknowledged the ambiguity and referenced emergency regulations enacted prior to October 2016; however, the Court declined to consider such arguments for purposes of ruling upon the motion as those facts were not plead in the Complaint. Nevertheless, such arguments are relevant to the extent that amendment would not be futile.

2015) (quoting 18 U.S.C. § 1346) (citing 18 U.S.C. §§ 1341, 1343). As for Scheme 2, Claimants contend that "[t]he Complaint fails to allege a 'quid pro quo' related to its allegations of 'honest services fraud.'" (Mot. 14.) "[W]hen the government seeks to prove honest services fraud in the form of bribery, it must prove a *quid pro quo*." *United States v. Inzunza*, 638 F.3d 1006, 1013 (9th Cir. 2011) (citing *United States v. Kincaid-Chauncey*, 556 F.3d 923, 943 (9th Cir. 2009)). "A *quid pro quo* in bribery is the 'specific intent to give or receive something of value *in exchange* for an official act.'" *United States v. Garrido*, 713 F.3d 985, 996–97 (9th Cir. 2013) (quoting *United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398, 404–405 (1999)). The *quid pro quo* "need not be explicit" and its "requirement is satisfied so long as the evidence shows a course of conduct of favors and gifts flowing to a public official *in exchange for* a pattern of official actions favorable to the donor." *Kincaid-Chauncey*, 556 F.3d at 943 (quotations and citations omitted).

Claimants argue that the complaint fails to meet the pleading standard for forfeiture complaints because it has not "ple[d] facially plausible facts from which Claimants can divine what specific official agreed to perform 'specific and focused' official acts in exchange for beneficial payments and, importantly, *when* that agreement was consummated." (Reply 7; Mot. 15.) A forfeiture complaint must "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." Supplemental Rule G(2)(f). Additionally, a forfeiture complaint must "state the circumstances from which the claim arises with such particularity that the defendant or claimant will be able, without moving for a more definite statement, to commence an investigation of the facts and to frame a responsive pleading." *See Aguilar*, 782 F.3d at 1108. The information in the complaint about Individuals 3 and 4—political figures in the CNMI—and their alleged conduct (Compl. ¶¶ 13–14, 23, 49–50, 52, 56–62) is sufficient for Claimants to commence an investigation of the facts and to frame a responsive pleading. *Cf. United States v. Smith*, 985 F. Supp. 2d 547, 555, 609 (E.D.N.Y. 2014) (denying motion

to dismiss honest services wire fraud counts of indictment for insufficient particularity even though one alleged conspiracy did not name political party officials). Additionally, based on the information in the complaint and the verified claim, Claimants themselves participated in the honest services fraud scheme. (Compl. ¶¶ 49–52, 54–62, 65–68; *compare* Verif. Claim 2 (identifying MCS as owner of bank accounts funds were seized from and Alfred Yue as sole member of MCS) *with id.* ¶¶ 1, 8 (identifying MCS as owner of bank accounts funds were seized from and "A.Y." as sole owner and operator of MCS); *see e.g.*, Mot. 16 (Claimants identifying Claimant Yue as "A.Y." in the complaint).) Thus, understanding that Claimants will receive additional identifying information in discovery materials, the complaint sufficiently alleges information about the identity of the public officials to survive dismissal.

Further, Scheme 2 sufficiently alleges the requisite *quid pro quo* bribery for honest services fraud. The Company sent A.Y. money through the Foreign Parent Company in Hong Kong to MCS Account 1 in the CNMI; those funds would then be moved from MCS Account 1 to MCS Account 2; then the funds in MCS Account 2 would be dispersed to politicians and those close to politicians. (*See* Compl. ¶¶ 58, 66–67.) The complaint details A.Y. using money he received from the Company to provide CNMI politicians, including Individual 4, various benefits such as "travel, golf, meals, drinking, and karaoke[.]" (*Id.* ¶¶ 52, 55.) Additionally, the complaint insinuates that A.Y. frequently withdrew $1,000 from the MCS Accounts and gave the cash to Individuals 1 and 2, who are "closely affiliated with" and frequently gave money to Individual 3. (*Id.* ¶¶ 56–57.) Also, the United States asserts that A.Y. made nearly $160,000 in payments for useless, nominal "services" from "MCS Account 2 to persons in the CNMI who could influence policy involving the Company, including one person close to Individual 4." (*See id.* ¶¶ 58–60.)

"In exchange for the benefits described . . . that A.Y. [provided], the CNMI government (with involvement from Individual 3, Individual 4, and other officials who benefitted from MCS's

largesse) extended the Company uniquely favorable treatment," which included "allowing the Company to escape liquidated damages after missing construction deadlines[;] extending the Company's operation and related deadlines with little or no penalty[;] amending regulations to accommodate the Company's development schedule[;] deferring enforcement of tax, labor, and other contractual obligations owed by the Company to the CNMI[;]" and "undermin[ing] various efforts to mandate that the Company either provide verifiable proof that it was financially capable of completing its construction project, or to at least post a 'completion bond.'" (*Id.* ¶¶ 61–62.) Further, the complaint alleges that "Individual 3 played an integral role in passage of the casino enabling legislation," which was signed into law in its final version in July 2014. (*Id.* ¶ 23.) The complaint sufficiently alleges a *quid pro quo* bribery scheme involving A.Y., MCS, Individuals 1 to 4, the Company, and others (*id.* ¶ 49), and supports a reasonable belief that Individuals 3 and 4 took official acts as a part of the scheme. *Cf. Comm. to Protect our Agric. Water v. Occidental Oil & Gas Corp.*, 235 F. Supp. 3d 1132, 1178–79 (E.D. Cal. 2017) (finding complaint failed to allege honest services fraud for RICO claim when plaintiffs did not allege *any* actions taken by officials in exchange for money or benefits). Again, understanding that additional information regarding the events will be uncovered through the discovery process, the complaint sufficiently pleads honest services fraud based on *quid pro quo* bribery. Because the complaint sufficiently alleges honest services wire fraud under 18 U.S.C. §§ 1343 and 1346 based on Scheme 2, and that funds were transmitted from Hong Kong to the CNMI with the intent to promote the honest services fraud scheme (Compl. ¶ 66), Scheme 2 supports a claim for international promotional money laundering forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A), 1956(a)(2)(A) and 1956(h). Accordingly, the Court denies the motion to dismiss on this basis.

However, the Court agrees with Claimants that Scheme 2, as alleged, fails to support both tainted funds forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and § 1957; and proceeds money

laundering forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 1956. The complaint fails to sufficiently allege that the Defendant Funds were derived from or are proceeds traceable to the honest services wire fraud alleged in Scheme 2. Tainted funds forfeiture and proceeds money laundering forfeiture require that the property is "derived from a specified unlawful activity," *United States v. Rogers*, 321 F.3d 1226, 1229 (9th Cir. 2003) (discussing requirements of 18 U.S.C. § 1957), or is obtained "as the result of the commission of the offense giving rise to forfeiture," 18 U.S.C. § 981(a)(2)(A). Further, 18 U.S.C. § 1957 criminalizes "a transaction in proceeds, not the transaction that creates the proceeds." *See United States v. Wilkes*, 662 F.3d 524, 545 (9th Cir. 2011) (quoting *United States v. Mankarious*, 151 F.3d 694, 705 (7th Cir. 1998)); *Rogers*, 321 F.3d at 1229. Here, the complaint fails to even allege that the Defendant Funds are derived from or proceeds of Scheme 2—the specified unlawful activity of honest services fraud. Instead, as the Court has already found, the complaint supports that the Defendant Funds were the instrument of the honest services fraud scheme. The complaint conclusorily asserts that "some" of the "transfers of funds from Account 1 to Account 2 consisted of . . . proceeds of the honest services fraud scheme" (Compl. ¶ 68), and does not provide facts to infer how the monetary transactions constituting the honest services fraud became proceeds. Thus, the Defendant Funds as described are the instruments used to effectuate the honest services fraud scheme alleged in Scheme 2; they are not distinct from the scheme and therefore are neither criminally derived from nor the proceeds of the scheme. For these reasons, the Court dismisses the claims for tainted funds forfeiture and proceeds money laundering forfeiture under Scheme 2.[5]

---

[5] The United States also alleges that Scheme 2 involved violations of 18 U.S.C. § 1956(a)(1) but does not specify which forfeiture provision it is applying in relation to that alleged violation. (*See* Compl. ¶¶ 3, 67.) However, regardless of which forfeiture provision applies, Section 1956(a)(1) criminalizes transacting in *proceeds* of unlawful activity, and as explained above, the complaint fails to demonstrate that the Defendant Funds are proceeds of Scheme 2.

### C.  Scheme 3 (Defrauding CNMI of Tax Revenue) Does Not Support Forfeiture.

At the hearing, the United States clarified that it was seeking international promotional money laundering forfeiture based on Scheme 3 pursuant to 18 U.S.C. § 981(a)(1)(A), rather than proceeds money laundering pursuant to Section 981(a)(1)(C). The Court agrees with both parties that forfeiture under Section 981(a)(1)(C) is inappropriate because the complaint fails to demonstrate that the Defendant Funds are proceeds of Scheme 3. The premise of Scheme 3 is that A.Y. defrauded the CNMI because he claimed "legal and professional fees" as business expenses, which reduced MCS's revenue and its associated tax liability, but failed to report that the Company reimbursed A.Y. for these payments. (Compl. ¶¶ 70–72.) To effectuate this scheme, the complaint explains that the reimbursements were sent from the Foreign Parent Company in Hong Kong to A.Y.'s Bank of China Account and "[t]hese transfers did not transit any U.S. bank account or company[.]" (*Id.* ¶¶ 72–73.) Because the reimbursements were sent "directly from one foreign bank account to another foreign bank account" (*id.* 72), it is implausible to infer from the complaint that the Defendant Funds seized in the CNMI are proceeds of the scheme.

Further, the international promotional money laundering forfeiture claim cannot survive because the complaint does not sufficiently allege that Scheme 3 constitutes specified unlawful activity. Claimants assert that Scheme 3 does not amount to wire fraud because "the Complaint fails to allege the jurisdictional element of a wire communication in interstate or foreign commerce." (Mot. 20.) The wire fraud statute penalizes

> [w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication *in interstate or foreign commerce*, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice . . . .

18 U.S.C. § 1343 (emphasis added). "'Foreign commerce' is a term of art which means 'commerce with a foreign country.'" *Wuxi City Runyuan Keji Ziaoe Daikuan Co. Ltd. v. Xu*, No. EDCV 13-00944 DDP (SPx), 2013 WL 3946549, at *4 (C.D. Cal. July 30, 2013) (quoting 18 U.S.C. § 10). "The use of a wire to transfer money occurring between foreign countries 'without any territorial nexus to the United States' is not criminalized by the wire fraud statute." *Id.* (quoting *United States v. Weingarten*, 632 F.3d 60, 71 (2d Cir. 2011)).

Here, the complaint only states the use of foreign wires in China to execute Scheme 3, and thus it lacks the jurisdictional requirement for wire fraud. The United States argues that "it is reasonable to infer that there were other domestic wire communications that prompted the overseas bank transfers." (Opp'n 17.) This is an unwarranted leap based on the facts at hand. As such, the Court agrees that the Complaint fails to allege the jurisdictional element required for wire fraud as to Scheme 3. Because Scheme 3 does not constitute wire fraud, it cannot serve as the specified unlawful activity for the United States' international promotional money laundering forfeiture claim.

## V.   CONCLUSION

Based on the foregoing, the Court grants in part and denies in part Claimants' motion to dismiss the complaint, with leave for the United States to amend its complaint. The First Amended Complaint is due within thirty days of this order.

IT IS SO ORDERED this 12th day of March, 2025.

_____
RAMONA V. MANGLONA
Chief Judge